Jeffrey ALNWICK and Marie Alnwick, Individually and as Big Blue Products, Inc., and alternatively, Jeffrey Alnwick and Marie Alnwick, individually and derivatively as Big Blue Europe, B.V., Plaintiffs,

v.

EUROPEAN MICRO HOLDINGS, INC., European Micro PLC, John B. Gallagher, and Harry D. Shields, Defendants,

and

Big Blue Europe, B.V., Nominal Defendant.

No. 99–CV–7380 (ADS).

United States District Court, E.D. New York.

March 22, 2001.

Cohen, Tauber, Spievack & Wagner, LLP, New York City by Jay B. Spievack, Mitchell Reiter, of counsel, for Plaintiffs.

Phillips, Nizer, Benjamin, Krim & Ballon, LLP, New York City by Stuart A. Summit, Michael Fischman, of counsel, for Defendants.

Houthoff, Buruma, The Netherlands by Peter Hustinx, of counsel, for Nominal Defendants.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This case concerns numerous allegations of fraud, breach of contract, and breach of fiduciary duty alleged by the Plaintiffs, who were participants in a joint venture. Presently before the Court is the Defendants' motion to dismiss based on the doctrine of *forum non conveniens*, or, in the alternative, for dismissal of the complaint for violation of Fed.R.Civ.P. 8(c).

### BACKGROUND

The Plaintiffs, Jeffrey and Marie Alnwick, ("Alnwicks") are owners of a New York corporation, Plaintiff Big Blue Products, Inc. engaged in the salvage and resale of computer components in the United States, and, to a lesser extent, in Europe. In 1996, Defendants Shields and Gallagher, owners of Defendant European Micro Holdings, an American corporation engaged, through a subsidiary corporation in England, in the sale of computer option products throughout Europe, approached the Alnwicks about creating a joint venture to expand Big Blue Products' business into the European market.

Following extended discussions and negotiations, the parties entered into three agreements in November or December 1996 to create the joint venture known as "Big Blue Europe." First, the Alnwicks, Shields, and Gallagher agreed to create a joint venture to be known as "Big Blue Europe" to engage in the sale of computer parts in Europe. The joint venture agreement included a non-competition provision, which prohibited Big Blue Europe from transacting business in the United States, and prohibited both Big Blue Products *and* Shields, Gallagher, and their European Micro Group companies from engaging in sales of computer parts in Europe, although Big Blue Products was permitted to maintain accounts with its few European clients. Second, the Alnwicks and the Shields/Gallagher team each agreed to contribute $132,500 in capital to the new venture, the Alnwicks' contribution to be made as inventory of computer parts, and the Shields/Gallagher contribution to be made in cash. In exchange, each pair received 50% of Big Blue Europe's stock. Third, the Alnwicks agreed to license the service mark "Big Blue" to Big Blue Europe. According to the complaint, all three of these agreements were oral.

On December 3, 1996, Big Blue Europe hired Bas Leeuwerke to manage its business affairs. By March 1997, Big Blue Europe, in part through the efforts of the Alnwicks, had secured several large clients. At the same time, efforts by Shields and Gallagher to obtain a $ 1.5 million line of credit with ABN Amro Bank fell through. According to the Alnwicks, during preliminary negotiations over the formation of Big Blue Europe, Shields and Gallagher touted their working relationship between European Micro Group and a bank known as Nat West, and promised that Nat West would "push ABN Amro Bank to provide a credit line without any guarantee." Shields and Gallagher refused, however, to permit European Micro Group to guarantee a loan to Big Blue Europe. According to the Alnwicks, European Micro Group did not assist Big Blue Europe in securing the line of credit because Shields and Gallagher were contemplating a stock offering in European Micro Group, and did not want to lessen the possible share price by assuming additional liabilities. However, Shields and Gallagher did not disclose to the Alnwicks their

intentions involving European Micro Group.

In May 1997, a European bank called Rabobank Beverwijk ("Rabobank") agreed to extend a credit line to Big Blue Europe in the amount of $ 500,000 if Big Blue Europe increased its capital holdings to that amount. The Alnwicks and Shields/Gallagher entered into a second oral agreement to contribute additional capital to the venture, with each team contributing $ 133,000 in the same manner as the original capital agreement.

At approximately the same time, Shields and Gallagher allegedly transferred their shares in Big Blue Europe to European Micro Group. Also, instead of contributing the additional $ 133,000 in cash, Shields and Gallagher instead arranged for European Micro Group to loan that sum to Big Blue Europe. In addition, the Defendants allegedly caused Big Blue Europe to record the Alnwicks' second contribution as a $ 133,000 "no interest loan that Big Blue Europe never was required to repay." All of these actions were allegedly done by the Defendants without the Alnwicks' knowledge.

In the summer of 1997, Shields and Gallagher approached the Alnwicks concerning the sale of their Big Blue Europe stock to European Micro Group. Shields and Gallagher allegedly told the Alnwicks that a publicly traded partner in the joint venture would allow Big Blue Europe access to additional capital sources, greater visibility, and other benefits, and denied that the arrangement would have any negative effect on the value of Big Blue Europe or the Alnwicks. However, according to the Alnwicks, however, Shields and Gallagher had already harmed Big Blue Europe by failing to diligently pursue the line of credit out of concern for European Micro Group's stock price; transferring their shares to European Micro Group

without informing the Alnwicks; and by mischaracterizing Shields and Gallagher's second capital contribution as a loan by European Micro Group so as to enhance its balance sheet, all without the Alnwicks' knowledge.

In August 1997, based on the Defendants' representations, the Alnwicks agreed to permit the Defendants to transfer their 50% ownership of Big Blue Europe to European Micro Group. The Alnwicks allege that this "cross-purchase agreement" somehow "placed personal debt obligations on the Alnwicks simply because they held fifty percent or greater of the shares of Big Blue Europe." The complaint is not specific as to what these obligations were, or to how the agreement "obligate[d] the Alnwicks personally for the debts of Big Blue Europe arising from undisclosed insider transactions."

In September 1997, Shields and Gallagher attempted to convince the Alnwicks to agree to take out a short-term $ 350,000 loan to expand Big Blue Europe's operations. Despite their reluctance, the Alnwicks agreed to incur the loan, based on European Micro Group's promise that the loan would allow it to introduce its own customers to Big Blue Europe. The Alnwicks allege that they would not have agreed to this loan had they known about other, unspecified "pre-existing debt obligations" the Defendants had already placed on Big Blue Europe.

In late 1997, in violation of the cross-purchase agreement and without the Alnwicks' knowledge, European Micro Group caused Big Blue Europe to pledge its capital to Rabobank in exchange for an additional line of credit. In April 1998, the Defendants allegedly fabricated a shareholders meeting to approve of the pledge of capital, even though the Alnwicks were never informed of any such meeting and did not participate.

On January 31, 1998, Shields and Gallagher sold European Micro Group to a new Nevada corporation they had formed, European Micro Holdings.

In March 1998, the Defendants demanded that Big Blue Europe change its inventory accounting methods, alleging that it violated generally accepted accounting principles. The Alnwicks contend that these allegations were false, that the Defendants had misrepresented the accounting methods to their auditors, and that the demand violated the original joint venture agreement, which provided that Big Blue Europe would use the same operational methods and practices as Big Blue Products in the United States. According to the Alnwicks, this change in accounting methods was intended to devalue Big Blue Europe to allow the Defendants to purchase it at a reduced price.

Also in March 1998, the Defendants met with the Alnwicks in Nashville, Tennessee. At that meeting, the Defendants criticized the operations and progress of the company, requested permission for Big Blue Europe to engage in operations in the United States, and offered to purchase the Alnwicks' shares. In response, the Alnwicks criticized the Defendants' ongoing failure to vigorously seek out additional clients. The Alnwicks rejected most of the Defendants' requests at the Nashville meeting, but did agree that the Defendants would take over the daily management of Big Blue Europe.

Upon assuming the daily management of Big Blue Europe, the Defendants allegedly implemented new policies and practices to devalue the company without consulting the Alnwicks, such as a large write-down of inventory in June 1998 to which the Alnwicks did not consent and a change in Big Blue Europe's fiscal reporting year.

In the fall of 1998, the Defendants allegedly caused Big Blue Europe to begin soliciting business in the United States, in violation of the joint venture agreement. The Defendants also instructed Leeuwerke to conceal this fact from the Alnwicks.

In January 1999, the Alnwicks and European Micro Holdings agreed to modify the non-competition provisions of the joint venture agreement to permit European Micro Holdings to sell certain new computer parts in Europe; in exchange, Big Blue Europe would be permitted to sell computer option products there. However, when Big Blue Europe attempted to sell the computer option products, European Micro Holdings told Big Blue Europe that such sales violated the non-competition agreement.

Also in January 1999, he Defendants allegedly asked Rabobank to increase Big Blue Europe's line of credit by a quarter million dollars. In response, Rabobank demanded that Big Blue Europe secure an additional $180,000 in capital. In response to what the Alnwicks contend were false promises that the additional capital was needed to support increased demand from European Micro Holdings clients that the Defendants were prepared to steer to Big Blue Europe, the parties each agreed to contribute another $ 90,000 in inventory to the company. According to the Alnwicks, the Defendants intended to again record their $ 90,000 contribution as a loan to Big Blue Europe. After delivering $ 37,500 worth of inventory, the Alnwicks discovered that Big Blue Europe did not intend to issue additional stock to represent the new infusion of capital. The Alnwicks suspended shipment of the remaining portion of their contribution and demanded information regarding European Micro Holdings' contribution, and discovered that no portion of the promised $ 90,000 had been paid.

In April and June 1999, after it became clear that Rabobank would not extend the $ 250,000 in credit to Big Blue Europe, the Defendants arranged for European Micro Holdings to make several loans to the company without the Alnwicks' knowledge or consent. In addition, the Defendants allegedly caused the company to improperly record the value of its inventory, further reducing the apparent assets of Big Blue Europe.

In early June, the Defendants allegedly falsely accused the Alnwicks of violating the non-compete agreement by selling computer parts in Europe. At the same time, according to the Alnwicks, the Defendants themselves were violating the agreement by soliciting customers in the United States. Accordingly, in early June 1999, the Alnwicks informed Defendant Shields that they wished to terminate the joint venture and dissolve Big Blue Europe. Defendant Shields allegedly responded that paperwork necessary to transfer the Shields/Gallagher shares to European Micro Holdings had never been filed, and thus, under Dutch law, the corporation could not be liquidated.

On July 16, 1999, European Micro Holdings offered to buy the Alnwicks' interest in Big Blue Europe for $ 200,000. By August 1999, the Alnwicks were able to obtain various financial records for the company that revealed many of the foregoing acts. In September 1999, the Alnwicks wrote to Leeuwerke and directed him to cease negotiations with Rabobank for an extension of Big Blue Europe's credit line; to cease accepting loans on behalf of the company; and to refrain from paying on any of the loans from European Micro Holdings that the Alnwicks had not consented to. In addition, they requested that a shareholders meeting be scheduled before the end of the month.

On September 17, 1999, the Defendants' attorney wrote to the Alnwicks repeating the $200,000 buyout offer and stating that, if the offer was not accepted by October 31, 1999, the Defendants would seek to collect on the outstanding loans to Big Blue Europe and liquidate the company. On October 4, 1999, the Alnwicks rejected the offer, but stated that they would make a counter-offer. The Alnwicks also demanded that Big Blue Europe cease its competition with Big Blue Products in the United States. On October 6, 1999, the Defendants responded, rejecting any possible counter-offer, and informing the Alnwicks that they intended to inform Rabobank that European Micro Holdings would be calling in its loans to Big Blue Europe on October 31, 1999 if the buyout offer was not accepted.

On October 8, 1999, the Alnwicks initiated a proceeding against the Defendants in the District Court of Amsterdam, Holland, seeking to attach European Micro Holdings' shares of Big Blue Europe and any loan proceeds owed by Big Blue Europe to the Defendants pending the outcome of the corporate disputes. The Alnwicks informed the Dutch Court that they would be filing a lawsuit against the Defendants within 4 weeks in both the United States and Holland. The Dutch court granted the attachment orders the same day, on the condition that the Alwnicks file their lawsuits within 30 days. The Alnwicks then commenced this action on November 12, 1999.

The complaint alleges 33 causes of action. The first cause of action accuses all of the Defendants of misappropriating the Alnwicks' trade secrets relating to Big Blue Products' customers, methods, and suppliers. The second cause of action against European Micro Holdings, Shields, and Gallagher charges common law fraud, citing numerous instances described above

in which these Defendants allegedly misrepresented their intentions and actions towards Big Blue Europe and the Alnwicks. The third cause of action, also for common-law fraud, accuses Defendant European Micro Holdings of misrepresenting the benefits of its own stock offering, while the fourth cause of action alleges that European Micro Holdings aided and abetted the frauds of the other Defendants. The fifth through eleventh causes of action charge various Defendants with breaches of the joint venture, capital contribution, cross-purchase agreements, non-competition, and licensing agreements. The twelfth through seventeenth causes of action allege that various Defendants tortiously interfered with the joint venture, cross-purchase, and capital contribution agreements, as well as with the employment agreement between Big Blue Europe and Leeuwerke. Causes of action nineteen through thirty allege either breach of fiduciary duty or aiding and abetting a breach of fiduciary duty with regard to the various events described above. The final three causes of action each allege tortious interference with Leeuwerke's employment agreement, and appear to be identical to claims in the thirteenth, fifteenth, and eighteenth causes of action.

The Defendants filed the instant motion seeking to dismiss the case based on the doctrine of *forum non conveniens* on the grounds that most of the witnesses and documents are located in the Netherlands, and most of the acts at issue took place there. In addition, the Defendants point out that a parallel lawsuit filed by the Plaintiffs in the Netherlands involves most of the same allegations and causes of action as this case. In the alternative, the Defendants seek dismissal of the complaint for prolixity pursuant to Fed.R.Civ.P. 8(a).

Following the full briefing of this motion, the Court has been flooded with correspondence from the parties citing recent Second Circuit cases on the issues involved, discussing developments in related proceedings in various international fora, and generally supplementing the parties' briefs. The Court has considered these additional, unscheduled supplements only to the extent of taking notice of the cited cases and reviewing the orders of the foreign tribunals; it has otherwise disregarded the parties' submissions as improper sur-replies.

## DISCUSSION

■■■ To obtain dismissal of an action on *forum non conveniens* grounds, a defendant must make a two-part showing. First, the defendant must establish that an appropriate alternative forum exists. *DiRienzo v. Philip Services Corp.*, 232 F.3d 49, 56–57 (2d Cir.2000); *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir.2000); *Alfadda v. Fenn*, 159 F.3d 41, 45 (2d Cir.1998). A foreign jurisdiction is an appropriate alternative forum if (i) the defendants are subject to service of process there, and (ii) the forum permits litigation of the subject matter in dispute. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *DiRienzo*, 232 F.3d at 56. An agreement by a defendant to subject himself to service of process in the foreign jurisdiction is sufficient to meet the first element of the test. *DiRienzo*, 232 F.3d at 56. The second element is satisfied so long as the foreign jurisdiction "permits litigation of the subject matter of the dispute, provides adequate procedural safeguards, and the remedy available in the alternative forum is not so inadequate as to amount to no remedy at all." *Id.; Piper*, 454 U.S. at 254, 102 S.Ct. 252; *Evolution Online Systems, Inc. v. Koninklijke Nederland N.V.*, 41 F.Supp.2d 447, 451 (S.D.N.Y.1999).

## A. Availability of an appropriate alternative forum

■ Defendants Shields and Gallagher have both submitted affidavits consenting to submit to the jurisdiction of the Dutch Courts should the instant case be dismissed. Thus, the Defendants have satisfied the first element of the test. However, there is sharp disagreement between the parties over whether a Dutch court provides an adequate opportunity to litigate the issues in this proceeding. For example, the Plaintiffs' Dutch attorney contends that fraud actions are highly unusual under Dutch law, and that Dutch procedural law does not provide for discovery and limits live testimony and cross-examination of witnesses. The Defendants' Dutch attorney denies these claims, and suggests that the judge-driven fact-finding process of Dutch law is an adequate substitute for litigation in the United States.

In this regard, the Court agrees with the Defendants. First, courts in this circuit have previously held that courts in the Netherlands present an adequate alternative forum for resolution of disputes such as this one. *Evolution Online*, 41 F.Supp.2d at 451; *Beekmans v. J.P. Morgan & Co.*, 945 F.Supp. 90, 92–93 (S.D.N.Y. 1996). Even assuming that Dutch law does not offer the Plaintiffs all of the advantages of litigating in this district, the Second Circuit has expressly held that even differences in substantive law that operate to the plaintiff's disadvantage in the foreign jurisdiction do not suffice to render a forum inadequate. *Piper*, 454 U.S. at 247, 102 S.Ct. 252; *DiRienzo*, 232 F.3d at 57–58; *Alfadda*, 159 F.3d at 45. While the Plaintiffs' Dutch attorney argues that fraud actions are "an unusual claim in Dutch civil proceedings," the Defendants' Dutch lawyer alleges that fraud actions are recognized there. In any event, the issue

is largely meaningless. This Court's cursory review of the complaint appears to indicate that the alleged fraudulent statements are essentially identical to those statements that form the basis of the oral joint venture agreement and the other contractual claims. This Court has repeatedly rejected fraud claims that arise out of contractual duties unless the plaintiff alleges a duty arising outside of the contract, a misrepresentation extraneous to the contract, or special damages. *See e.g. DS Capital, Inc. v. Carlisle Sports Emporium, Inc.*, 116 F.Supp.2d 376, 378 (E.D.N.Y.2000), citing *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir.1996); *Pacs Industries v. Cutler-Hammer, Inc.*, 103 F.Supp.2d 570, 571–72 (E.D.N.Y.2000); *Bell Sports, Inc. v. System Software Assocs. Inc.*, 45 F.Supp.2d 220, 227 (E.D.N.Y.1999). Further, even assuming that Dutch law does not recognize the tort of fraud, an alternative jurisdiction is not rendered inappropriate simply because not all of the contemplated causes of action are available there, so long as the general subject matter of the litigation can be heard there. *Piper*, 454 U.S. at 247, 102 S.Ct. 252; *DiRienzo*, 232 F.3d at 57–58.

The same considerations apply to procedural law. The Plaintiffs assert that a Dutch forum is inappropriate because the right of cross-examination in restricted and because pre-trial discovery is not as readily available. However, the Supreme Court in *Piper* only requires the alternative forum to offer "adequate procedural safeguards," 454 U.S. at 254, 102 S.Ct. 252, not identical ones. Given the breadth and latitude of the discovery tools and evidentiary rules in the United States, if a court held that the failure of a foreign jurisdiction to offer these same mechanisms was a sufficient basis to deny a *forum non conveniens* dismissal, no such dismissals would ever occur.

Secondly, the Court observes that the Plaintiffs themselves instituted a substantive Dutch lawsuit in reaction to some of the events at issue here. In their application for the attachment order before the Dutch court, the Plaintiffs assured the court that "The principal proceedings *will be commenced* in the United States of America and *in the Netherlands.*" (Emphasis added.) On the day before this action was filed, the Plaintiffs commenced a Dutch lawsuit against European Micro and European Micro Holdings, alleging contract, tort, and breach of fiduciary duty claims. While the Plaintiffs argue that the Dutch action was filed simply to preserve the effect of the attachment order until the United States action could be filed and was thereafter withdrawn, the Court nevertheless finds that the Netherlands offers an appropriate forum in which the Plaintiffs could press their claims.

Accordingly, the Defendants have demonstrated the first element of the two-part *forum non conveniens* analysis the existence of an adequate alternative forum.

### B. As to the balancing of factors

The second element requires a balancing of factors reflecting both public and private interests in the action as set forth by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). Among those factors of private interest to the litigants are the ease of access to sources of proof; the availability of compulsory process; the expense of obtaining the attendance of willing witnesses; other practical problems in holding a trial; and the enforceability of any judgment received. 330 U.S. at 508, 67 S.Ct. 839; *see also Alfadda*, 159 F.3d at 46. Factors in the public interest to be considered include the administrative burdens on the courts of trying a case remotely from the events at issue; the signifi-

cance that the case bears to jurors in the forum; and the familiarity of the forum's courts with the appropriate law to be applied. *Id.* at 508–09, 67 S.Ct. 839; *Alfadda*, 159 F.3d at 46. In weighing these factors, the plaintiff's chosen forum is to be given great weight, and the defendant's motion should be granted only where the balance of these factors tilts strongly in its favor. *Id.* The Court will address each of these factors individually.

### (i) Ease of access to sources of proof

While this large, complicated, multinational litigation will certainly rely on many sources of proof, the nature of the claims suggest that the single most important source of facts is the corporate books and business records of Big Blue Europe. It is clear from the complaint that these books and records are kept in the Netherlands by Leeuwerke and Big Blue Europe's accountant, Nataja Verweord. For example, the complaint states that "defendants . . . cause Mr. Leeuwerke and Ms. Verweord to record [the Defendants'] capital contributions in this manner" and "On July 8, 1999, the Alnwicks and Big Blue Products contacted the defendants and Bas Leeuwerke to request that Big Blue Europe provide the Alnwicks with, among other things, the company's Shareholder's Registry."

The Plaintiffs argue that the litigation should not be transferred, as the Civil Code in the Netherlands would deprive it of subpoena power over these records, rendering them inaccessible. The Court is not persuaded by this argument. The Plaintiffs have submitted an affidavit from their Dutch attorney that acknowledges that "the Alnwicks clearly were entitled to documents from the company under the Dutch Civil Code," and that same code presumably offers them mechanisms to obtain documents when access is unlawfully

denied. Moreover, the affidavits of the Dutch attorneys for both sides establish that the trial judge, as factfinder, has the authority to request the production of documents from the parties and has the ability to draw negative inferences should a party fail to produce the requested items. In addition, a motion by the Defendants to stay discovery while this motion was pending was denied by the Magistrate Judge, and the parties have already engaged in extensive discovery. In fact, the Plaintiff acknowledges in a November 17, 2000 letter to the Court that some "850,000 pages [of discovery have been] produced by Plaintiffs, third-parties and Defendants to date." Finally, the Court has the option to condition a *forum non conveniens* dismissal on the condition that the defendants produce documents relevant to the plaintiff's claims. *Piper*, 454 U.S. at 257 n. 25, 102 S.Ct. 252.

The Plaintiffs also suggest that copies of many of Big Blue Europe's corporate documents are likely to be available from the Defendants' offices in the United States. However, the Plaintiffs' argument on this point appears to be pure speculation, and there is no evidence in the papers before this Court to establish such a claim. *See e.g. Evolution Online*, 41 F.Supp.2d at 452 ("While plaintiff alleges there are relevant documents in New York, it largely fails to identify or quantify them").

### (ii) Availability of compulsory process

The affidavit by the Alnwicks' Dutch attorney makes clear that both the United States and Dutch courts lack the power to compel non-citizens outside their borders to appear for testimony. Thus, analysis of this factor turns on whether the majority of non-party witnesses are citizens of the Netherlands, the United States, or neither.

The two most important witnesses, Leeuwerke, the operational manager of Big Blue Europe, and Verweord, its accountant, are both Dutch citizens and subject only to the issuance of process in the Netherlands.

The Alnwicks cite some three dozen additional witnesses, located mostly in the United States, that allegedly have knowledge of the events at issue in the case. However, some of these witnesses have knowledge on mostly irrelevant issues, such as the details of European Micro Holdings' IPO or "the course of dealings between Big Blue Products and Big Blue Europe," which the extensive complaint barely mentions. Based upon the Court's review of the complaint and the affidavits setting forth the summary of the witnesses' knowledge, the Court concludes that only a handful of non-party witnesses relevant to the Plaintiffs' case would be beyond the reach of the Dutch court's compulsory process.

Similarly, the Defendants list some seven witnesses located in the Netherlands and England that they claim will be necessary to the litigation. Like the witnesses identified by the Plaintiffs, some of the Defendants' designated witnesses will have little relevance to the proceedings, while others, such as Big Blue Europe's sales manager Erik Diden, may be more important to the case. Upon reviewing the descriptions of the witnesses and the nature of their expected testimony submitted by both sides, the Court concludes that the availability of compulsory process factor tilts in favor of trying the case in the Netherlands, largely because of the presence of the major witnesses, such as Leeuwerke and Verweord. This is a major factor in the resolution of this case.

For similar reasons, trial in either jurisdiction will pose significant expense in obtaining the attendance of witnesses, another of the *Gilbert* factors. Other than the Plaintiffs and the employees of Big Blue

Products who are identified as possible witnesses, every other potential witness will have to travel to the Eastern District of New York for trial. Similarly, other than the employees of Big Blue Europe who, presumably, live in the same geographical area as the appropriate Dutch court, all of the other potential witnesses will have to travel to the Netherlands to testify if this case is dismissed. On balance, however, the significance of the testimony of Big Blue Europe's managers to this litigation outweighs burden of producing Big Blue Products employees in the Netherlands, and thus, this factor also tilts in favor of dismissal.

### (iii) Practical problems in holding a trial

The Defendants allege that the bulk of the corporate records and other documents are in Dutch, and would therefore require translation to be used in this proceeding. The Plaintiffs hotly contest this assertion, and state that "92% of the documents produced by Big Blue Europe to date are in English." The Plaintiffs' assert that most of Big Blue Europe's business in conducted in English, while Leeuwerke claims that most internal company documents are in Dutch. Leeuwerke's affidavit contends that his ability in English is only of a "conversational" level, which would be insufficient for giving precise testimony. No evidence has been submitted about the accountant Verweord's ability to speak English, nor the Plaintiffs' ability to speak Dutch. The parties have identified several potential third-party witnesses—primarily customers of Big Blue Products and financial officials—in the United States, England, and the Netherlands. Although the parties do not specifically address the language issue, the Court will presume that the witnesses located in the United States and England are not proficient in Dutch, and that none of the third-party witnesses

in the Netherlands are proficient in English. In sum, it is inevitable that some kind of translation would be necessary regardless of whether the proceedings were held in the United States or the Netherlands.

### (iv) Enforceability of a judgment

Neither party has submitted any evidence with regard to the enforceability of a judgment obtained in either forum.

### (v) Administrative burdens on the court

Turning to the "public factors" in the *Gilbert* analysis, the Court first considers the administrative burdens of holding trial in a jurisdiction remote from the locus of the major events at issue. The concerns discussed above regarding availability of witnesses and language translation are the most prominent burdens to be considered.

In addition, the parties argue about the extent to which the Court should consider the effect of parallel litigation occurring in the Netherlands, as well as a companion case that is apparently pending before an English court. While the Second Circuit observed in *Guidi v. Inter–Continental Hotels Corp.*, 224 F.3d 142, 148 (2d Cir. 2000), that "the existence of related litigation ... is not listed as a relevant factor in the *forum non conveniens* analysis laid out in *Gilbert*," the facts in that case involved parallel litigation in foreign courts brought by and against unrelated parties. *See also DiRienzo*, 232 F.3d at 63 (refusing to consider related Canadian lawsuit brought by different plaintiffs as factor). The *Guidi* court expressly distinguished its holding from cases in which the same parties were involved in related foreign litigation, *id.* ("we can find no case that gives such litigation [such] significance ... when, [as here] the parties in the related action are completely different from the parties at bar"), and where there was a likelihood of "significant duplication of legal efforts on be-

half of all the parties." *Id., citing C–Cure Chem. Co. v. Secure Adhesives Corp.,* 571 F.Supp. 808, 822 (W.D.N.Y.1983) (dismissing U.S. trademark case for *forum non conveniens* in favor of pending Canadian litigation between the parties) *and Ocean Shelf Trading, Inc. v. Flota Mercante Grancolombiana S.A.,* 638 F.Supp. 249, 253 (S.D.N.Y.1986) (dismissal of tort case in favor of action pending between same parties in Colombia). From its review of the applicable law, this Court concludes that while the existence of related litigation involving different parties is not a factor to be weighed under the *Gilbert* analysis, the possible duplication of judicial effort by another court hearing identical claims by the same parties is a factor of public concern, in that it imposes an unnecessary administrative burden on the Court.

The parties submissions describe three pending actions filed by the Defendants in the Dutch courts and the attachment action filed by the Plaintiffs and subsequently withdrawn. The parties have also made passing reference to a defamation action currently pending in England, but no substantial details regarding that action have been provided to the Court. All three pending Dutch actions arise from the same transactions described herein, but two of the actions, the "Haarlem Action" and the "Enterprise Action" appear to seek only a court-ordered valuation of the company's shares and the appointment of an independent director respectively, not an actual assessment of damages or determination of specific personal liability. The third pending Dutch action seeks to redress a dispute over the value of the capital contributed by the Alnwicks and the proper method of recording that contribution in the company's books.

Having reviewed the Dutch pleadings and affidavits by the parties' Dutch attorneys, the Court is still unable to determine the precise extent to which adjudication of this case would constitute duplicated effort in the Dutch actions. Although the parties have supplied affidavits from their Dutch attorneys generally describing the purpose of each action and what the parties intend to argue to the court, neither side has clearly set forth the elements of each cause of action under Dutch law or the factors that will be weighed by the Dutch courts. Under these circumstances, this Court gives little weight to the existence of the actions proceeding in the Netherlands as a factor to be weighed.

### (vi) Significance of the case to jurors in this forum

The Plaintiffs argue that jurors in the Eastern District of New York have an interest in the result of this lawsuit on the grounds that the Alnwicks themselves reside in the district and that Big Blue Products employs many residents of this district.

To the extent that the Alnwicks bring claims in their own name, the jurors of this District have some interest in protecting their fellow citizens against injuries inflicted by others. However, to the extent that the most of those injuries appear to arise from an intra-corporate dispute between directors and shareholders over the proper management of a Dutch corporation, the jurors in this District have a minimal interest in the subject matter of the case.

The Court's review of the complaint suggests that Big Blue Products does not have a major interest in the outcome of the litigation, being primarily involved only in the causes of action alleging breach of the covenant not to compete in the United States and the misappropriation of trade secrets claim. Those claims are discussed in further detail below. Accordingly, while the jurors of the Eastern District of New York might have an interest in determin-

ing claims by Big Blue Products, such an interest would be greatly diminished by the number of claims in this matter which do not involve Big Blue Products in any way.

To the extent that the Alnwicks assert claims derivatively on behalf of Big Blue Europe, however, such claims have little significance to the jurors of this District. Big Blue Europe is a Dutch corporation with no significant business contacts in the Eastern District of New York.

### (vii) Familiarity with the law to be applied

■ Dismissal is favored where the Court would be required to "untangle problems in conflict of laws, and in law foreign to itself." *Piper*, 454 U.S. at 251, 102 S.Ct. 252. The complaint mixes causes of action under both tort and contract theories, and is alleged by New York residents, partially on behalf of a Dutch corporation, against residents of Florida and Tennessee, a Nevada corporation, and an English corporation. Consequently, the case presents complex choice of law issues. A federal court sitting in a diversity case applies the choice of law rules of the state in which it sits. *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1538–39 (2d Cir.1997);

The causes of action in the complaint can be divided into four major groups: breach of contract, fraud, tortious interference with contract, and breach of fiduciary duty. Under New York State law, the law to be applied in a breach of contract action depends on the "center of gravity" of the claim, namely, which jurisdiction has the most significant connection to the dispute. *Matter of Arbitration between Allstate Ins. Co.*, 81 N.Y.2d 219, 226, 597 N.Y.S.2d 904, 907, 613 N.E.2d 936 (1993); *Eagle Ins. Co. v. Singletary*, 279 A.D.2d 56, 717 N.Y.S.2d 351, 352–53 (2d Dept.2000); *Carribean Constr. Svcs. & Assocs., Inc. v.*

*Zurich Ins. Co.*, 267 A.D.2d 81, 83, 700 N.Y.S.2d 129, 131 (1st Dept.1999).

In analyzing which forum has the strongest connection to the dispute, the traditional choice of law factors—the place of contracting, the place of negotiation and performance, the location of the subject matter of the contract, and the domicile or place of business of the contracting parties—are to be given great weight. *Id.* In tort cases, the court considers which jurisdiction has "the greatest interest in the litigation, and relies, almost exclusively, on the parties' domiciles and the locus of the tort." *Schultz v. Boy Scouts of America*, 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679 (1985); *see also Cooney v. Osgood Machinery Inc.*, 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 922, 612 N.E.2d 277 (1993); *Krock v. Lipsay*, 97 F.3d 640, 646 (2d Cir.1996). A tort is considered to have occurred where the last event necessary to make the actor liable occurred—typically, the place where the injury is felt. *Schultz*, 65 N.Y.2d at 195, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679; *Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 683 N.Y.S.2d 179, 189 (1st Dept.1998). When the conflicting laws relate primarily to standards of conduct, the locus of the tort is most important whereas conflicts over apportionment of liability for clear violations will usually be governed by the law of the parties' domiciles. *Id.*, 65 N.Y.2d at 198, 491 N.Y.S.2d at 95–96, 480 N.E.2d 679.

Of course, crucial to the resolution of this issue is also the principle that questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation. *Scottish Air Intl. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1234 (2d Cir. 1996), *citing First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). Here, Big Blue Eu-

rope is incorporated under the laws of the Netherlands.

The parties did not extensively address the choice of law issue, and the Court lacks many of the facts necessary to fully analyze the issue. For example, the complaint is silent on where the various agreements were negotiated and executed, although the Plaintiffs' affidavits allege generally that the agreements were negotiated "predominantly" in New York and the United States. Accordingly, the Court will engage in a preliminary analysis of the choice of law issue solely for the purpose of assessing this factor.

The Plaintiffs' first cause of action, misappropriation of trade secrets, is most likely governed by the law in which the injury occurred—presumably, the United States. *See Frink America, Inc. v. Champion Road Machinery, Ltd.*, 48 F.Supp.2d 198, 205 (N.D.N.Y.1999) (misappropriation in Canada of New York corporation's trade secrets was governed under New York law as effects of the unfair competition were felt by corporation in New York State). The Defendants' citation to *Blimpie Intl. Inc. v. ICA Menyforetagen AB*, 1997 WL 143907 (S.D.N.Y.1997) is not applicable here. In *Blimpie*, the defendants utilized the trade secrets to compete with the plaintiff only in Sweden; here, the Plaintiffs allege that Big Blue Europe competed with them on their home turf in the United States. Accordingly, U.S., not Dutch, law would govern the first cause of action.

The second cause of action alleges common law fraud against Defendants Shields, Gallagher, and European Micro, while the third and fourth causes of action allege fraud against European Micro Holdings. In all three causes of action, the alleged fraud involves allegations that the Defendants falsely promised to "use their 'best efforts' to secure a credit line for the joint venture company; use their 'best efforts'

to support Big Blue Europe's financial and business interests; [and] make their required capital contributions to Big Blue Europe." While these tort claims would ordinarily be governed by the law of the place where the injury is felt, namely New York, *Schwartz, supra*, an additional consideration is also involved. Determination of whether these representations were false will require analysis of the internal actions of Big Blue Europe. In other words, a determination of whether the Defendants "use their best efforts to support Big Blue Europe's business interests" will necessarily entail an examination of the acts undertaken on Big Blue Europe's behalf by the Defendants. Because Big Blue Europe is a corporation organized under Dutch law with an office in the Netherlands, disputes over the internal acts of a company are governed by the law of the state of incorporation—here, the Netherlands. Accordingly, a persuasive argument could be made that proof of the Plaintiffs' fraud causes of action are more tied to matters that will require the application of Dutch corporate law. In any event, the Court has serious questions as to whether the fraud claims are even viable, in view of their link to the breach of contract claims. *D.S. Capital, supra.; Bell Sports, supra.* Accordingly, the Court gives little weight to the choice of law issue on the fraud claims.

The fifth through eleventh causes of action allege breaches of various contractual agreements including the joint venture agreement, the cross-purchase agreement, and several capital contribution agreements. As stated above, in contract actions, the Court must apply the law of the jurisdiction having the greatest interest in the litigation, by primarily considering the place of contracting, the place of negotiation and performance, the location of the subject matter of the contract, and the

domicile or place of business of the contracting parties. Here, while the place of negotiation and contracting of the various agreements is assumed to be the United States, and most of the parties involved are domiciled in the United States the place of performance and subject matter of the joint venture, capital contribution, and cross-purchase agreements is the Netherlands: the joint venture agreement addressed the formation and operation of a Dutch corporation; the capital contribution agreements dealt with financing the Dutch corporation; and the cross-purchase agreement involved the sale of shares in a Dutch corporation between American citizens and an English corporation. Only one agreement, the cross-purchase agreement, contains any choice of law provision, and that one states "This agreement shall be governed by the laws of the State of Florida, USA, or, where necessary, by the laws of the Netherlands." Under these circumstances, and particularly in light of the fact that many of the alleged breaches of these agreements will necessarily entail analysis of the internal actions of the Dutch corporation, the Court finds that the Netherlands has a stronger interest than the United States in addressing the issues raised, and that the breach of contract claims would most likely be decided under Dutch law.

The twelfth through eighteenth and thirty-first through thirty-third causes of action allege tortious interference with various agreements by the various Defendants. Once again, the locus of these torts would generally be the United States, where the injuries claimed by the Plaintiff were felt. Some claims, however, such as claims that the Defendants tortiously interfered with Leeuwerke's employment agreement, would certainly be governed by Dutch law. Moreover, as with the fraud claims, proof of these causes of action will necessarily entail an adjudication of the propriety of various internal actions by a Dutch corporation and its directors. For example, if the acts of the Defendants in securing various loans or changing their accounting methods without approval by the Alnwicks is not considered wrongful under Dutch corporate law, the Plaintiffs will be unable to establish an essential element of their tortious interference claim. See e.g. Finley v. Giacobbe, 79 F.3d 1285, 1294 (2d Cir.1996) (elements of tortious interference with contract claim are (i) a valid contract; (ii) a third party's knowledge of the contract; (iii) intentional and improper procurement of a breach of the contract; and (iv) damage to plaintiff resulting from the breach). Under these circumstances, the Court finds that the tortious interference with contract claims will likely be governed in large part by Dutch corporate laws.

Finally, the nineteenth through thirtieth causes of action, arguably the crux of this lawsuit, allege a breach of fiduciary duty or aiding and abetting a breach of fiduciary duty. In each cause of action, the acts constituting the alleged breach involve the actions undertaken by the Defendants in their roles as directors and shareholders of Big Blue Europe. Under New York's choice of law rules, a claim of breach of fiduciary duty owed to a corporation is governed by the law of the state of incorporation. Walton v. Morgan Stanley & Co., 623 F.2d 796, 798 n. 3 (2d Cir.1980); BBS Norwalk One, Inc. v. Raccolta, Inc., 60 F.Supp.2d 123, 128–29 (S.D.N.Y.1999). Because Big Blue Europe was incorporated under the law of the Netherlands, Dutch law would apply to the nineteenth through thirtieth causes of action. While an argument could be made by the Plaintiffs that some of these causes of action assert a fiduciary duty that arises from the status of the parties as joint venturers—rather than their status as directors of Big

Blue Europe—and that such a duty should be judged by the law of the state in which the joint venture was agreed to, the Court nevertheless believes that Dutch law would ultimately govern such claims. Notably, the sole purpose of the joint venture was to create and operate the Dutch corporation, and thus, any fiduciary duties resulting from the parties' status as joint venturers would be effectively identical to the fiduciary duties owed by the parties as directors of the corporation. Moreover, the particular acts which are alleged to constitute the breaches of the fiduciary duty owed to the Plaintiffs as joint venturers invariably involve corporate acts taken by the Defendants as officers and directors of Big Blue Europe. Thus, even if the Court were to construe some of the Plaintiffs' fiduciary duty claims as springing from their status as co-venturers, Dutch law would still be required to determine the legality of the particular acts alleged to constitute a breach of that duty.

While it is possible that factual development of the case might ultimately result in New York State law being applied to some of the causes of action, it appears that, on balance, Dutch law will be applied to the majority of claims. Accordingly, this factor weighs significantly in favor of dismissal.

### (viii) Balancing the factors

Having established the factors to be considered, the Court must now determine the weight to give each one, keeping in mind that the Plaintiffs' choice of forum is to be given "great weight." *Gilbert,* 330 U.S. at 508–09, 67 S.Ct. 839. Even giving strong consideration to the Plaintiffs' desire to litigate the case in their home district and even though most of the litigants on both sides are United States citizens, the Court finds that this litigation—with the exception of the causes of action for misappropriation of trade secrets and breach of the

non-compete agreements—is best pursued in the Dutch courts. The heart of this case involves allegations that the Defendants misused a Dutch corporation, diminishing the value of the Plaintiffs' shares of that corporation. Obviously, the Dutch courts have a much stronger interest in policing the conduct and protecting the shareholders of corporations organized under their laws. In this regard, the present case is much different from *DiRienzo,* on which the Plaintiffs rely.

In *DiRienzo,* the plaintiffs were primarily American citizens who had purchased stock in the Canadian defendant company on a United States stock exchange. 232 F.3d at 54–56. In a subsequent action for stock fraud, the Second Circuit reversed the district court's dismissal on *forum non conveniens* grounds in favor of trial in Canada and returned the case to the Southern District of New York for further proceedings. *Id.* at 67. However, one of the primary reasons for the court's decision was the fact that the United States had a stronger local interest in deciding the case than the district court had found, based upon the fact that "many of the plaintiffs' securities transactions were conducted entirely in the United States, by Americans, in American dollars, on American stock exchanges." *Id.* at 63. The court drew a contrast between that situation and ones in which "the transactions at issue had little or no connection with the U.S." *Id.* at 64 ("[this case] does not involve Americans who sought out involvement with a foreign forum"), *citing inter alia, Scottish Air Intl. v. British Caledonian Group PLC,* 81 F.3d 1224, 1233–34 (2d Cir.1996) (dismissing action brought by American plaintiff seeking seat on board of directors of Scottish corporation on *forum non conveniens* grounds).

Indeed, the distinction between *Scottish Air* and *DiRienzo* highlights the reason

why dismissal of this case on *forum non conveniens* grounds is appropriate. While the Plaintiffs attempt to characterize this case as a simple dispute by American investors who were defrauded out of the value of their investment in a foreign corporation—the situation faced by the court in *DiRienzo*—this Court views this matter as more of an intra-corporate dispute between a foreign corporation and its American directors—similar to the situation in *Scottish Air*. The Plaintiffs here were not simply ordinary investors; rather, they purposefully entered into an agreement to form and participate in the management of a Dutch corporation, and now seek damages relating to various corporate acts done by the Defendants that diminished the value of their ownership in that corporation. Only a few of the Plaintiffs' claims, most notably the claim that the Defendants breached the non-competition covenant with Big Blue Products, involve acts which do not directly implicate managerial and operational actions made by the Defendants as directors and shareholders of Big Blue Europe.

The other cases primarily relied upon by the Plaintiffs, *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142 (2d Cir.2000) and *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir.2000), do not alter this analysis. In *Guidi*, the Second Circuit reversed a *forum non conveniens* dismissal that would have forced the plaintiffs, victims of a terrorist attack in Egypt, to sue the defendant, an American corporation, in Egypt. 224 F.3d at 147. The decision is *Guidi* is most notable for the Second Circuit's reiteration of the weight to be given the plaintiff's choice of forum. However, the court went on to acknowledge that trial in the plaintiff's home forum is not necessarily appropriate where "trial in the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal prob-

lems." *Id.* at 146. The court went on to find that "this is not a case where the plaintiff is a corporation doing business abroad and can expect to litigate in foreign courts." *Id.* Obviously, this same conclusion does not apply with equal force to the present case. The crux of the Plaintiffs' complaint here arises from their business abroad and their decision to incorporate Big Blue Europe under the laws of the Netherlands should clearly have raised an expectation that disputes over corporate acts would be subject to the Dutch courts. Accordingly, while this Court agrees with and is bound by *Guidi*'s articulation of the strong deference to be given to the plaintiffs' chosen forum, this case is factually distinct from *Guidi* and fits within the exception set forth by the court in that case.

The *Wiwa* case is even less applicable here. In *Wiwa*, the plaintiffs were Nigerian citizens who alleged a series of human rights abuses committed in Nigeria by the Nigerian Government and orchestrated by the defendant Royal Dutch Petroleum Co. 226 F.3d at 92–93. In reversing a *forum non conveniens* dismissal by the Southern District of New York, the Second Circuit noted that the lower court had failed to take notice that two of the plaintiffs were U.S. citizens, and thus entitled to deference towards their chosen forum; and that the trial court also failed to give due consideration to the legislative intent of the Torture Victims Protection Act, 28 U.S.C. § 1350. *Id* at 103–07. Once again, this Court is mindful of the strong deference to be given to the Plaintiffs' chosen forum as discussed in *Wiwa*. Nevertheless, the Court finds that the balance of the *Gilbert* factors, most importantly the public factors involving the courts' hesitation to attempt to apply foreign law to basically foreign factual situations, tilt the balance strongly in favor of dismissal. Unlike the

plaintiffs in *Wiwa*, the Plaintiffs here will not be economically disadvantaged by dismissal of this case. Indeed, the Plaintiffs are already defending themselves against the three pending actions filed by the Defendants in the Netherlands, and thus, a dismissal would allow them to wage the legal battle on only one front instead of two. The Court is mindful that such a decision will compel the Plaintiffs to travel to the Netherlands for hearings and other trial proceedings, but notes that routine travel to the Netherlands must have been contemplated by the Plaintiffs when they decided to incorporate Big Blue Europe in that location.

While an important factor weighing in favor of transfer is the Court's reluctance to attempt to apply Dutch law, this Court recognizes that that reluctance alone is not a sufficient basis to dismiss an action on *forum non conveniens* grounds. *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 492 (2d Cir. 1998). However, that factor, coupled with other factors, such as the unavailability of process to secure key witnesses such as Leeuwerke and Verweord, and the predominance of documentary evidence located in the Netherlands, and the fact that the overall factual thrust of this action revolves around events that occurred in the Netherlands under Dutch corporate law is sufficient to overcome the deference given to the Plaintiffs' choice of forum.

Accordingly, the Court concludes that, despite the residence of the Plaintiffs and Defendants and the desire of the Plaintiffs to litigate this case in the United States, the factors set forth in *Gilbert* weigh strongly in favor of dismissing this action on *forum non conveniens* grounds in favor of proceedings in the Netherlands. However, in an effort to ameliorate the prejudice this dismissal may have on the Plaintiffs, the Court finds that a conditional

dismissal should be granted. Accordingly, dismissal is conditioned on the Defendants agreeing to submit themselves to the jurisdiction of the Dutch courts throughout the pendency of any action relating to the complaint herein. *P.T. United Can Co. v. Crown Cork & Seal*, 138 F.3d 65, 75 (2d Cir.1998). Moreover, in recognition of the Plaintiffs' assertions that they have been rebuffed in their good-faith efforts to obtain corporate records, the Court also conditions this dismissal on the Defendants making all of the books and records of Big Blue Europe available to the Plaintiffs for inspection and copying. *Dowling v. Hyland Therapeutics Div.*, 767 F.Supp. 57, 60 (S.D.N.Y.1991). Upon a breach of these conditions, the Plaintiffs will be permitted to petition this Court to vacate this decision and reinstate this action.

### C. Severance of the misappropriation of trade secrets and breach of the non-competition agreement claims.

In light of the severability of the misappropriation of trade secrets and breach of the non-competition agreement causes of action—causes of action which accrued entirely in the United States and which are governed by New York law—the Court granted the Plaintiffs the option to request that those claims be severed and tried separately in the United States. In a letter dated February 8, 2001, the Plaintiffs consented to the severance of these claims, and further requested an opportunity to also add "related fraud claims predicated upon Defendants' intent, *ab initio*, to steal and use Plaintiffs' trade secrets for competing again, among others, Big Blue Products in the computer parts market."

The Plaintiffs' request ignores the Court's prior holdings that fraud claims arising from a party's breach of a contractual duty are not generally actionable.

*See D.S. Capital, Inc.,* 116 F.Supp.2d at 378; *Pacs Industries,* 103 F.Supp.2d at 571–72; *Bell Sports,* 45 F.Supp.2d at 227. To the extent that the fraud claims are related to the agreement by the Defendants that Big Blue Europe would not compete in the United States, the fraud claims do not allege a duty distinct from the contractual obligation. To the extent that the Plaintiffs seek to assert fraud claims in connection with the misappropriation of trade secrets claim, for which there does not appear to be a separate contractual duty, the Court nevertheless finds that such a claim would be inappropriate. While the Plaintiffs contend that the Defendants' fraudulent inducements to them to enter into the contracts violated "a separate duty not to use Plaintiffs' trade secrets outside of the joint venture," that argument appears to simply couch the duty not to misappropriate trade secrets in different words. *See e.g. Greene v. Luckman,* 233 A.D.2d 256, 650 N.Y.S.2d 144, 144–45 (1st Dept.1996) (suggesting that claim for fraudulent inducement can be deemed duplicative of claim for misappropriation of trade secrets and unfair competition).

Accordingly, the Court grants leave to the Plaintiff to file an amended complaint containing only claims that (i) the Defendants misappropriated the Plaintiffs' trade secrets as set forth in the First Cause of Action, and (ii) the Defendants caused Big Blue Europe to violate the non-competition portion of the Joint Venture Agreement by competing in the United States with Big Blue Products, as described in Paragraph 48 of the complaint. The Plaintiff is directed to file and serve this amended complaint within 20 days of the date of this decision.

## CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss the complaint on *forum non conveniens* grounds is GRANTED, subject to the Defendants submitting themselves to jurisdiction in the Netherlands for any action arising out of the acts alleged in the complaint, and on the condition that the Defendants make available all books and records of Big Blue Europe to the Plaintiffs for inspection and copying.

The Plaintiffs are granted leave to file an amended complaint containing only causes of action for misappropriation of trade secrets as set forth in the First Cause of Action and for breach of the non-competition agreement described in Paragraph 48 of the complaint within 20 days of the date of this decision.

**SO ORDERED.**