Abdulaziz A. **ALFADDA**, Yusif Bin Ahmed Kanoo, a Partnership Company, Abddullah Abbar, Abdulaziz Kanoo, Ahmed A. Zainy, Abdulla Kanoo, Abdulrahman A. Al–Turki, Abdulrahman H. Sharbatly, Saad A. Alissa, and Abdullatif A. Alissa, Plaintiffs–Appellants,

v.

Richard A. **FENN**, Alef Bank, S.A., Alef Investment Corporation N.V., Saudi European Bank, S.A., Jamal Radwan, Saudi European Investment Corporation, N.V., Saudi Arabian & European Finanz Corp. B.V., Societe D'Analyses et D'Etudes Bretonneau, and Societe de Banque Privee (SBP), Defendants–Appellees.

No. 97–7867.

United States Court of Appeals, Second Circuit.

Argued May 11, 1998.

Decided Sept. 28, 1998.

42

Andrew L. Frey, Mayer, Brown & Platt, New York City (John M. Aerni, Leboeuf, Lamb, Greene & MacRae, New York City, Craig B. Glidden, Timothy J. Hill, Keith A. Rowley, Glidden Partners, LLP, Houston, Texas, Dan M. Kahan, Chicago, Illinois, Christopher Armeniades, Paris, France, of counsel), for plaintiffs-appellants.

David R. Jewell, Donovan, Leisure, Newton & Irvine LLP, New York City, (Alison S. Berger, Luigi D. Vissicchio, of counsel), for defendants-appellees Jamal Radwan, Saudi European Investment Corporation, N.V., Alef Investment Corporation N.V., and Alef Bank, S.A.

Robert Ted Parker, Berg, Ziegler, Anderson & Parker LLP, San Francisco, California, (Jeffrey B. Kirschenbaum, Joel Freid, of counsel), for defendants-appellees Saudi European Bank, S.A. and Société d'Analyses et d'Etudes Bretonneau.

Frank H. Wohl, Lankler, Siffert & Wohl, New York City, (Curtis B. Miner, of counsel), for defendant-appellee Société de Banque Privée (SBP).

BEFORE: WALKER, MCLAUGHLIN, Circuit Judges, and SHADUR, Senior District Judge.*

## BACKGROUND

MCLAUGHLIN, Circuit J.

Saudi European Investment Corporation ("SEIC") is incorporated in the Netherlands Antilles to invest Saudi Arabian capital in "Western markets." SEIC's stock is not publicly traded. Until 1989, its principal asset was Saudi European Bank ("SE Bank"), a French-licensed bank, headquartered in Paris. Although SEIC maintained an office in New York, and SE Bank had a branch there, SEIC's operations were indisputably based in France; and it dealt almost exclusively with money from Saudi Arabia. Both SEIC and SE Bank were run by the Chairman of SEIC, Jamal Radwan.

Under its Deed of Incorporation, SEIC was authorized at its founding to issue 40,000 voting shares. It initially issued only 20,000 shares, which were sold in its first offering in 1979. Following a 30:1 split in 1983, there were 600,000 issued shares outstanding and 600,000 more authorized, but unissued, shares.

In 1984, SEIC sought to raise $60 million in capital through a private stock offering of its remaining 600,000 authorized shares. These shares were offered pursuant to a Subscription Agreement and Private Placement Memorandum ("PPM"), which made certain representations about SEIC's financial condition and business plan. The PPM represented that the 1984 offering would consist of 600,000 voting shares to be sold for $100 each and that if the offering was oversubscribed, nonvoting shares would then be issued. Finally, the PPM provided that none of the shares would be sold in the United States. The PPM was prepared for SEIC in the United States by Ronald Reilly, the president of a Texas corporation retained by SEIC to help it raise money.

A number of wealthy Saudi businessmen purchased 600,000 shares in SEIC's 1984 private offering. However, after the 1984 offering closed, Radwan converted certain SEIC "capital notes" (which were essentially stock options) into shares of SEIC voting stock. The existence of the capital notes was not disclosed in the PPM.

Radwan owned 600,000 of the capital notes, which he converted into 600,000 shares of SEIC stock by paying SEIC $33 per share. Radwan then sold the shares to Charles Keating's now infamous Lincoln Savings and Loan for $100 per share. The effect, of course, was that SEIC had now sold 1.2

* The Honorable Milton I. Shadur of the United States District Court for the Northern District of Illinois, sitting by designation.

million voting shares, rather than the 600,000 shares originally contemplated. SEIC, however, did not disclose the sale of the extra shares in the PPM. Moreover, Radwan's sale to Keating contradicted the PPM's representation that shares would not be sold in the United States.

Around 1988, SE Bank began to stumble. A number of French banks with ties to the Middle East had failed in the late 1980's; and the French government began to fear that SE Bank would also fail. In 1988 and 1989, the Governor of the Bank of France requested that SEIC shareholders deposit funds into SE Bank to solve its liquidity problems. However, no shareholders responded. In November 1989, the French government ordered Radwan either to sell the bank to new investors or face the involuntary liquidation of SE Bank. Radwan chose to sell the bank.

The Commission Bancaire, France's banking regulatory authority, became an active player in the sale of SE Bank. Prospective purchasers were required to obtain the Commission Bancaire's approval of a plan to stabilize the bank to avoid future liquidity crises. After an audit of the bank's condition, it was sold for approximately $3.4 million. The new owners injected $9.8 million into SE Bank and rechristened it Société de Banque Privée, S.A. ("SBP"). As a result of the sale, SEIC shareholders lost all equity in SE Bank.

Soon after the sale of SE Bank, the new entity, SBP, became embroiled in several American lawsuits arising out of SEIC's and Radwan's dealings with Charles Keating. SBP was sued in several investor class actions. The United States' Resolution Trust Company also sued SBP as the successor to SE Bank. To insulate SBP from these claims, French banking authorities reorganized SBP and placed SE Bank's former American holdings in an entity called Société d'Analyses et d'Etudes Bretonneau ("Bretonneau"). Soon after the spin-off, Bretonneau's banking license was revoked by French authorities and its only business then became the liquidation of SE Bank's former American business.

In July 1987, Abdulrahman Sharbatly, a Saudi investor, filed a criminal complaint in the French *Tribunal de Grande Instance* against Radwan and SEIC, alleging that the misrepresentations contained in the PPM constituted fraud under French penal law. He also filed a civil complaint against Radwan and SEIC involving the same transactions. Under the French criminal code, a private party may bring a civil action for damages (*action civile*) based on a criminal offense, and may initiate a criminal prosecution if the state fails to do so.

One year later, Abdulrahman Al–Turki and Abdullatif Alissa, who also invested in SEIC, filed separate criminal complaints against SEIC with the *Tribunal de Grande Instance*. The Saudi investors charged that "unknown persons" associated with SEIC concealed the existence of Radwan's convertible capital notes and misrepresented in the PPM both the number of shares to be sold in the 1984 offering and the financial condition of SEIC in 1984.

The French examining magistrate indicted Radwan for the crime of "swindling" under Article 405 of the French Penal Code. In October 1994, the *Tribunal Correctionnel* in Paris acquitted Radwan of the criminal charges, and the Court of Appeals for Paris later affirmed the acquittal.

In April 1989, while the French actions were proceeding, Al–Turki, Saad Alissa, Abdullatif Alissa, Abdulaziz Alfadda, Abdullah Abbar, Yusif Bin Ahmed Kanoo (a Saudi Arabian partnership), and Ahmed Zainy filed a civil complaint against Radwan and SEIC in the Court of First Instance in Curaçao, Netherlands Antilles. The plaintiff-shareholders alleged that they purchased SEIC shares in 1984 on the basis of the defendants' misrepresentations regarding SEIC's capital structure.

In September 1989, part of the litigation now before us started. Alfadda, Abbar, Abdulla Kanoo, Abdulaziz Kanoo, Yusif Bin Ahmed Kanoo, and Zainy sued Radwan, SEIC, SE Bank, SBP, Bretonneau, Richard Fenn (Vice–Chairman of SEIC), Alef Bank, S.A., and Alef Investment Corporation N.V. in the United States District Court for the Southern District of New York (McKenna, J.) (the "*Alfadda* action"). The investors

alleged that the defendants violated Section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, by: (1) misrepresenting SEIC's value at the time of the 1984 offering; (2) diluting SEIC's stock by selling too many shares in 1984; (3) failing to disclose the existence of the capital notes held by Radwan; and (4) misappropriating SEIC funds (the "SEIC claims"). Plaintiffs also alleged New York state common law claims for fraud and breach of fiduciary duty.

In 1990, Judge McKenna dismissed the *Alfadda* action for lack of subject matter jurisdiction because the claims had no connection to the United States. This Court reversed Judge McKenna, finding that the action had a sufficient connection to this country because of the sales to Keating's Lincoln Savings and Loan. *Alfadda v. Fenn,* 935 F.2d 475, 478 (2d Cir.1991).

On July 5, 1990, Al–Turki, Sharbatly, and the Alissas filed yet another complaint against the *Alfadda* defendants in the United States District Court for the Southern District of New York (the "*Al–Turki* action"). The *Al–Turki* plaintiffs alleged that Fenn, Radwan, SEIC, SE Bank, Alef Investment Corporation N.V., and Alef Bank, S.A. violated RICO by manipulating SBP's assets during SBP's restructuring to prevent plaintiffs from obtaining damages on the SEIC claims (the "SBP claims"). The *Al–Turki* and *Alfadda* actions were consolidated before Judge McKenna.

In 1992, after the *Alfadda* action was remanded to Judge McKenna, the defendants moved for dismissal of the consolidated actions on the ground of *forum non conveniens.* Judge McKenna denied the motion, concluding that although France might be a more convenient forum, the balance of interests did not tilt particularly in its favor. The parties then conducted significant discovery for three years under the supervision of Magistrate Judge Katz.

In 1996, defendants again moved to dismiss the consolidated cases on *forum non conveniens* grounds. This time Judge McKenna granted the motion, reasoning that

the suit had little connection to the United States and that France would be a more convenient forum. In addition, Judge McKenna concluded that some of the plaintiffs' claims would also be barred by res judicata due to Radwan's acquittal in France and that the court did not have subject matter jurisdiction over the SBP claims. Plaintiffs now appeal, arguing, *inter alia,* that Judge McKenna misapplied the doctrine of *forum non conveniens.*

## DISCUSSION

### I. *Forum Non Conveniens*

Plaintiffs argue that, given the massive discovery and preparation that went into this suit, application of the *forum non conveniens* doctrine was inappropriate. We disagree.

■ Our review of a *forum non conveniens* dismissal is severely cabined. *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). "[IT]he decision lies wholly within the broad discretion of the district court and should be reversed only if that discretion has been clearly abused." *Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 46 (2d Cir.1996) (internal quotation marks and citation omitted); *see Boosey & Hawkes Music Publishers, Ltd. v. The Walt Disney Co.,* 145 F.3d 481, 491 (2d Cir.1998) (limited but "meaningful" review). A *forum non conveniens* analysis proceeds in two steps.

■ First, the court must determine that there is an adequate alternative forum somewhere. *See Piper,* 454 U.S. at 254 n. 22, 102 S.Ct. 252; *Peregrine Myanmar,* 89 F.3d at 46. An alternative forum is adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits "litigation of the subject matter of the dispute." *Piper,* 454 U.S. at 254 n. 22, 102 S.Ct. 252. That the law of the foreign forum differs from American law "should ordinarily not be given conclusive or even substantial weight" in assessing the adequacy of the forum. *Id.* at 247, 102 S.Ct. 252.

Having concluded that an adequate alternative forum does exist, the court must then weigh the public and private interests identi-

fied in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), to determine which forum "will be most convenient and will best serve the ends of justice." *Peregrine Myanmar,* 89 F.3d at 46. If a district court focuses on all the *Gilbert* factors before dismissing a case on *forum non conveniens* grounds, we accord its decision "substantial deference." *See Piper,* 454 U.S. at 257, 102 S.Ct. 252.

■ The public interests include: (1) having local disputes settled locally; (2) avoiding problems of applying foreign law; and (3) avoiding burdening jurors with cases that have no impact on their community.

The private interests include: (1) ease of access to evidence; (2) the cost for witnesses to attend trial; (3) the availability of compulsory process; and (4) other factors that might shorten trial or make it less expensive. *See Piper,* 454 U.S. at 241, 102 S.Ct. 252; *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839.

■ In assessing convenience, "[t]here is ordinarily a strong presumption in favor of the plaintiff's choice of forum." *Murray v. British Broad. Corp.,* 81 F.3d 287, 290 (2d Cir.1996) (citations omitted); *see Piper,* 454 U.S. at 255, 102 S.Ct. 252 ("strong presumption in favor of the plaintiff's choice of forum"); *Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 1001 (2d Cir.1993) ("strong presumption"). Thus, dismissal usually is not appropriate unless "the balance of convenience tilts strongly in favor of trial in the foreign forum." *R. Maganlal & Co. v. M.G. Chem. Co.,* 942 F.2d 164, 167 (2d Cir. 1991). However, this presumption is weaker when the plaintiff is foreign. *See Piper,* 454 U.S. at 255–56, 102 S.Ct. 252 ("the presumption applies with less force when the plaintiff or real parties in interest are foreign"); *Murray,* 81 F.3d at 290 (foreign plaintiff's choice of forum "entitled to less deference") (citation omitted); *R. Maganlal,* 942 F.2d at 168.

Neither side challenges Judge McKenna's conclusion that France is an adequate alternative forum. The only issue, therefore, is whether Judge McKenna properly weighed the *Gilbert* factors.

## A. *Public Interest Factors*

### 1. Gilbert *Factors*

■ Judge McKenna properly concluded that the *Gilbert* public interest factors weigh strongly in favor of France as a forum. First, the interest in having local disputes settled locally weighs heavily against the United States as a forum. This case involves a dispute between a Netherlands Antilles corporation and Saudi Arabian shareholders over the conduct of a French bank. Thus, France has a far greater interest in this litigation than the United States. *See Allstate,* 994 F.2d at 1002.

The complications of applying foreign law do not weigh in favor of either forum. In adjudicating plaintiffs' RICO and securities laws claims, an American court would apply American law. If the case is transferred to France, however, French law would apply and a consideration of American law would be unnecessary. *Cf. Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1362, 1366 (2d Cir. 1993) (English court would not apply RICO and United States securities laws). While plaintiffs will not be able to avail themselves of the benefits of United States securities and racketeering laws in the French forum, "*forum non conveniens* dismissal is not trumped simply because the foreign forum will apply different substantive law than an American court." *Capital Currency Exch., N.V. v. National Westminster Bank PLC,* 155 F.3d 603, 609–10 (2d Cir.1998) (citations omitted). Moreover, the difference in applicable substantive law is properly considered when assessing whether an adequate alternative forum exists, an issue that plaintiffs do not challenge on appeal. *See Piper,* 454 U.S. at 254–55, 102 S.Ct. 252; *PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 74 (2d Cir.1998).

The interest in protecting jurors from sitting on cases with no relevance to their own community weighs heavily in favor of France. This suit involves not only plaintiffs' investment in a Netherlands Antilles holding company that owned a French-licensed bank, but also a challenge to a bank restructuring ordered and supervised by French banking authorities. Thus, French jurors have a

more significant interest in this case than American jurors. *See Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1233–34 (2d Cir.1996) (Great Britain had greater interest in litigation involving inquiry into internal affairs of British corporation); *Allstate*, 994 F.2d at 1002 (Australia had greater interest in resolving fraud claims related to largest liquidation in Australian history).

## 2. Interest in Application of Domestic Law

Plaintiffs argue that the United States has a significant interest in applying RICO and securities laws to international transactions. Plaintiffs assert that in dismissing the action, Judge McKenna should have considered this significant public interest, and that this interest weighs heavily in favor of the United States as a forum.

Plaintiffs make two, distinct arguments. First, they contend that *forum non conveniens* dismissal is never proper when a plaintiff alleges a violation of RICO or securities laws. In the alternative, they assert that the United States' interest in applying RICO and securities laws to this case justifies reversing Judge McKenna.

 Plaintiffs' initial argument, that *forum non conveniens* dismissal is never appropriate when a plaintiff alleges a federal securities or racketeering cause of action, is clearly wrong. We have specifically held to the contrary. *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 74 (2d Cir. 1998) (RICO); *Allstate*, 994 F.2d at 1002 (securities); *Transunion Corp. v. PepsiCo, Inc.*, 811 F.2d 127, 130 (2d Cir.1987) (per curiam) ("A review of the legislative history of RICO ... discloses no mandate that the doctrine of forum non conveniens should not apply....").

We also reject plaintiffs' alternative contention that the United States' interest in applying its own securities and RICO laws to the international financial transaction at issue made the Southern District a more convenient forum. We recognize that this argument finds some support in our previous decisions, at least in regard to securities actions. In *Allstate*, we noted that "United States courts have an interest in enforcing United States securities laws." *Allstate*, 994 F.2d at 1002; *see Capital Currency*, 155 F.3d at 611–12, (Sherman Act); *cf. Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir.1991) (United States had a sufficient interest in seeing its securities and RICO laws applied to justify exercising *subject matter jurisdiction* over plaintiffs' claims).

However, we made clear that this interest is merely one consideration to be weighed in the totality of the *Gilbert* analysis. *Allstate*, 994 F.2d at 1002 ("[T]his [interest] alone does not prohibit [United States courts] from dismissing a securities action on the ground of forum non conveniens."); *see Capital Currency*, 155 F.3d at 611–12 ("[W]e have never held that the United States' interest in applying its laws is a determinative factor to be considered in weighing convenience.") (citations omitted). Because the traditional *Gilbert* public interest factors weigh heavily in favor of France, we do not agree that the United States' interest in applying its securities and RICO laws rendered Judge McKenna's decision to dismiss on the grounds of *forum non conveniens* an abuse of discretion.

### B. Private Interests

#### 1. Traditional Private Interest Factors

Judge McKenna correctly concluded that the private interests involved in this case also strongly favor litigating in France. First, *all* the defendants and *nearly all* the documentary evidence are located in France. *See Murray*, 81 F.3d at 294–95; *Blanco v. Banco Industrial de Venezuela S.A.*, 997 F.2d 974, 982–83 (2d Cir.1993). In addition, the cost for witnesses to attend trial will be significantly lessened if trial is held in France because almost all the entities involved are based there. *See Blanco*, 997 F.2d at 982; *Allstate*, 994 F.2d at 1001. Moreover, France is much closer to Saudi Arabia, so it will presumably be easier for the plaintiffs to travel there. *See Schertenleib v. Traum*, 589 F.2d 1156, 1165 (2d Cir.1978) (Geneva more convenient forum when "[a]ll of the prospective witnesses, apart from [the defendant], either are Swiss or reside in European countries").

Finally, compulsory process is available in France to secure the live testimony of necessary foreign witnesses outside the reach of United States process. *See, e.g., Schertenleib,* 589 F.2d at 1165 (inability to bring witness to United States for live cross-examination before fact-finder "[p]erhaps the most significant problem" making litigation in United States court inappropriate). The ability to secure witness testimony takes on added importance in this action because "where, as here, appellants have alleged fraud, live testimony of key witnesses is necessary so that the trier of fact can assess the witnesses' demeanor." *Allstate,* 994 F.2d at 1001 (citation omitted); *see Scottish Air,* 81 F.3d at 1233; *Schertenleib,* 589 F.2d at 1165.

### 2. *Pretrial Discovery*

Plaintiffs' major argument on the *Gilbert* factors is that significant discovery was conducted, and has been completed, in the Southern District of New York. Plaintiffs contend that the extent of completed discovery weighs heavily in favor of the United States as a forum because: (1) Judge McKenna and Magistrate Judge Katz acquired unusual familiarity with this action in the course of resolving approximately 15 discovery disputes; (2) plaintiffs would be forced to recommence discovery in France since Judge McKenna's previous order precluding the use of discovery in the French *action civile* prevents the parties from using the existing discovery material in a subsequent French civil proceeding; and (3) plaintiffs' financial investment in translating documents from French to English and videotaping depositions of witnesses outside the reach of United States process would be wasted. We are not persuaded.

■ As an initial matter, plaintiffs failed to raise this issue with sufficient particularity before Judge McKenna, thereby waiving their right to raise it on appeal. *See, e.g., Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

Even if we turn a blind eye to the waiver, plaintiffs' argument remains unpersuasive. Although an issue of first impression in this Court, the Third, Fifth, and Tenth Circuits have concluded that the extent of completed discovery in the American forum is a relevant—but not necessarily dispositive—consideration in assessing convenience. *See Lony v. E.I. Du Pont de Nemours & Co.,* 935 F.2d 604, 613–14 (3d Cir.1991); *Schexnider v. McDermott Int'l, Inc.,* 817 F.2d 1159, 1163 (5th Cir.1987); *Gates Learjet Corp. v. Jensen,* 743 F.2d 1325, 1335 (9th Cir.1984).

There appears to be some disagreement, largely of academic interest, as to whether the extent of completed discovery should be considered a public or a private interest under the *Gilbert* analysis. *Compare Schexnider,* 817 F.2d at 1163 (public interest) *with Gates,* 743 F.2d at 1329 (private interest) *and Lony,* 935 F.2d at 613–14 (discovery "goes to both private concerns . . . and public ones"). We see little need to address this quibble, or even whether it should be considered at all in the *Gilbert* analysis. Assuming, *arguendo,* that the extent of completed discovery is relevant—whether as a public or private interest—we do not believe that it tips the balance towards an American forum. The traditional public and private interest factors weigh heavily in favor of France. Completing discovery within the Southern District and investing financial resources in order to facilitate trial in the United States does not sufficiently tip the scales of the *Gilbert* balance, especially since plaintiffs are free to use the existing discovery material to whatever extent the French tribunal will permit.

We do not read Judge McKenna's prior order as preventing the parties from using discovery materials in a future civil proceeding. Judge McKenna ordered that "[n]o discovery obtained in the present action is to be used in the litigations pending in France or the Netherlands Antilles." The order barred the use of discovery in any *pending* action. It does not bar the use of such material in a *future* civil litigation.

Finally, none of the plaintiffs are United States citizens and the *Gilbert* factors strongly favor France as a forum. Thus, we apply a weaker presumption in favor of plaintiffs' forum, and that presumption has been overcome. *See Piper,* 454 U.S. at 255–56, 102 S.Ct. 252.

As we find that the district court did not abuse its discretion in dismissing this case on the ground of *forum non conveniens,* we do not address appellants' arguments concerning the other bases for the district court's dismissal.

## CONCLUSION

Balancing the *Gilbert* factors favors France as a forum. Given the deferential standard of review applicable in *forum non conveniens* inquiries, we find no abuse of discretion in dismissing on *forum non conveniens* grounds. Accordingly, the judgment of the district court is AFFIRMED.