294 F.3d 21
 Gabriel DIRIENZO; Alan Bilgore; Paul Blanchard; Robert Gans, Ira; Robert Gans; A. Carl Helwig; Barry Zemel; Gregory N. Mappus; Herb Sudzin; Vincent Ditrano; Bruce E. Toll, Ira; Bruce E. Toll; Jane Lanzo; Internet Capital Inc.; Deborah Mieczkowski; Joseph H. Misiewicz; Colin Low; Hazel M. O'Brien; Douglas Schmidt; Charles K. Fasold; Richard Greve; Grace Shum; Ronald Glotzer; Richard Hershey; Ronald McElroy; Charles Miller; Deborah S. Greve; Robert W. Hillger; Carol F. Brink Revocable Trust; William R. Brink, Ira; William R. Brink Revocable Trust; Walter Chompski; Bradwal Investments Ltd.; Local 138, 138A & 138B International Union Of Operating Engineers Fringe Benefit Funds; Melvyn B. Fliegal; James Collins; Albert Solkov; Michael And Sophia Isaacs; Lee Pitman; Kenneth Hare; Thomas Leth; Levi Sabol; and Lawrence M. Siegel; on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,
v.
PHILIP SERVICES CORPORATION; Allen Fracassi; Philip Fracassi; Marvin Boughton; Robert Waxman; John Woodcraft; Colin H. Soule; Norman Foster; Felix Pardo; Howard L.
 Beck; Ray Cairns; William E. Haynes; Robert L. Knauss; Derrick Rolfe; Herman Turkstra; Salomon Brothers, Inc.; Merrill Lynch, Pierce Fenner & Smith Incorporated; BT Alex. Brown Incorporated; Morgan Stanley & Co., Incorporated; CIBC Oppenheimer Corp.; Credit Suisse First Boston Corporation; Donaldson, Lufkin & Jenrette Securities Corporation; Lehman Brothers Inc.; Schroder & Co., Inc.; Smith Barney Inc.; Furman Selz LLC; Arnhold and S. Bleichroeder, Inc.; Blackford Securities Corp.; First Albany Corporation; McDonald & Company Securities, Inc.; Janney Montgomery Scott Inc.; WM Smith Securities, Incorporated; Deloitte & Touche, Chartered Accountants, Defendants-Appellees.
 Docket No. 99-7825.
 United States Court of Appeals, Second Circuit.
 Filed: November 22, 2000.
 Decided: April 1, 2002.
 
 COPYRIGHT MATERIAL OMITTED Neil L. Selinger, Jeanne F. D'Esposito, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY; Jeffrey C. Block, Michael T. Matraia, Berman, DeValerio & Pease LLP, Boston, MA, of counsel, for Plaintiffs-Appellants DiRienzo, et al.
 Jack M. Weiss, John T. Behrendt, Marshall R. King, Gibson, Dunn & Crutcher LLP, New York, NY, of counsel, for Defendant-Appellee Deloitte & Touche.
 Gerald A. Novack, David S. Versfelt, Kirkpatrick & Lockhart LLP, Stuart I. Shapiro, Michael I. Allen, Shapiro Forman & Allen LLP, Frederick P. Schaffer, Schulte Roth & Zabel LLP, New York, NY; Charles W. Schwartz, Vinson & Elkins LLP, Craig R. Smyser, Smyser Kaplan & Veselka LLP, Houston, TX, of counsel, for Defendants-Appellees Director-Officers.
 Brad S. Karp, Michael E. Gertzman, Amy B. Vernick, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY, of counsel, filed a brief for Defendants-Appellees Underwriter Defendants.
 Allan A. Capute, Harvey J. Goldschmid, David M. Becker, Eric Summergrad, Securities and Exchange Commission, Washington, DC, of counsel, filed a brief for the Securities and Exchange Commission, Amicus Curiae, in support of Appellants.
 Before CARDAMONE, CABRANES, Circuit Judges, and TRAGER,* District Judge.
 Judge CABRANES concurs in part and dissents in part in a separate opinion.
 PETITION FOR REHEARING
 CARDAMONE, Circuit Judge.
 Philip Services Corporation (Philip), a Canadian metal processing company, is alleged to have perpetrated a massive fraud upon its shareholders, the vast majority of whom are United States investors. After Philip stock prices plummeted and extensive securities fraud litigation was commenced in different states and in Canada, the Judicial Panel on Multi-District Litigation transferred all of the American suits — at Philip's request and over the objections of several plaintiffs — to the United States District Court for the Southern District of New York (Mukasey, J.). There they were dismissed, prompting two appeals that were argued together before us in March 2000.
 The plaintiffs in DiRienzo, the first appeal, sued as representatives of an as-yet uncertified class of Philip investors who bought stock during the proposed class period. Most Philip shares traded during that period were sold in the United States. The DiRienzo defendants include Philip directors and officers, Philip's accountants Deloitte & Touche, LLP (Deloitte), a member of Deloitte Touche Tohmatsu, a federation of affiliated accountants headquartered in New York City, and the American underwriters of the 1997 public offering. The Liff plaintiffs in the second appeal sold their interests in five American corporations for Philip stock and cash, and sued certain Philip directors and officers for alleged fraud in connection with the sales.
 Both cases were dismissed under the doctrine of forum non conveniens. Hillger v. Philip Servs. Corp. (In re Philip Servs. Corp. Sec. Litig.), 49 F.Supp.2d 629 (S.D.N.Y.1999). We reversed the district court in a split decision entered November 8, 2000. DiRienzo v. Philip Servs. Corp., 232 F.3d 49 (2d Cir.2000) (Cabranes, J., dissenting). Following that decision, the DiRienzo and Liff defendants petitioned for a rehearing. We denied the petition in Liff on February 6, 2001.
 
 
 1
 While the petition in DiRienzo was pending, this Court issued an en banc opinion in Iragorri v. United Technologies Corp., 274 F.3d 65 (2d Cir.2001). Iragorri addressed a question common to that case and DiRienzo — as well as Guidi v. Inter-Continental Hotels Corp., 224 F.3d 142 (2d Cir.2000), and Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88 (2d Cir.2000) — namely, "what degree of deference should the district court accord to a United States plaintiff's choice of a United States forum where that forum is different from the one in which the plaintiff resides." 274 F.3d at 69. Finding the answer in Iragorri dispositive of the appeal in DiRienzo, we now grant the petition for rehearing in DiRienzo, vacate so much of our prior opinion as pertains to the DiRienzo action, and issue this decision reversing the judgment of the district court.
 
 BACKGROUND
 
 2
 Philip has its principal offices in Hamilton, Ontario, Canada, with subsidiaries in the United States. Philip decided to become a dominant player in the metal recovery and processing industry in the United States. From 1992-1997 it purchased 15 American companies and maintained facilities in 12 states. These efforts thereafter generated 70 percent of its corporate revenue. To raise money to carry out its corporate plans it sold stock in the United States and Canada.
 
 
 3
 Philip stock was traded on the New York Stock Exchange, the Toronto Stock Exchange, the Montreal Stock Exchange, and NASDAQ until April 30, 1996. In November 1997 it placed two secondary stock offerings that raised $380 million, of which $284 million came from United States investors and $94 million came from Canadian investors.[1] To tout its 1997 stock offerings Philip aggressively promoted the stock, traveling to United States cities with "road shows," issuing press releases, and filing financial reports with the Securities and Exchange Commission (SEC). Nearly 80 percent of the shares traded in Philip's stock during the class period traded on United States exchanges.
 
 
 4
 After reporting substantial increases in earnings for the years 1995-1997, the company announced on January 26, 1998 that it would take "charges to earnings" for the 1997 fiscal year of between $250 and $275 million. The company attributed 60 percent of the charges to a restructuring and acquisition program and to an overvaluation of goodwill. Two months later Philip announced that the 1997 charges to earnings were actually $310 million, based in part on a $125 million overstatement of inventory. Additional company disclosures made in the following weeks included a further charge to 1997 income of $35 million arising from the improper recording of a copper-related transaction. Total charges against 1997 income equaled $381.2 million.
 
 
 5
 As a result, top officers resigned or were demoted. In addition, Philip has since restated its 1995 and 1996 financial statements to reduce 1995 earnings by $22.5 million and 1996 earnings by $48.4 million. Thus, instead of posting a $28.4 million profit in 1996 as initially reported, it reported a $20 million loss. Philip's share price plummeted from $13 1/8 on January 26, 1998 to $2 9/16 in July 1998, after which it traded below $2 per share.
 
 
 6
 The DiRienzo complaint alleges four wrongful schemes. First, the "metals recovery division fraud" entailed a variety of alleged accounting irregularities in the Hamilton, Ontario-based Metals Recovery Group, then headed by Robert Waxman. The alleged irregularities included failure to record transactions, overstatement of inventories, and improper deferral of losses. According to the complaint, the accounting discrepancies were resolved by Philip's taking a Canadian $192.67 million (United States $134 million) charge to income, ascribed by the company to copper trading losses in January 1998, when in fact the losses were primarily due to an overstatement of inventory.
 
 
 7
 Second, the "industrial services group fraud" involved two alleged misrepresentations associated with the 1996 acquisition of the Petrochem S.C. facility in South Carolina. Philip is claimed to have improperly capitalized $8 million in 1996 losses rather than taking them as current expenses. The company also allegedly assumed $15 million in environmental remediation liability when acquiring the facility, but failed to record it.
 
 
 8
 Third, the "fraudulent 1997 third quarter results," announced November 5, 1997, allegedly included some $24.2 million in fictitious earnings meant to bolster Philip's sale price for the November 1997 offering that closed on November 12, 1997. Fourth, "Waxman's fraud," for which Philip filed suit against Waxman in Ontario, centered around Waxman's alleged orchestration of transactions that diverted Philip's assets to himself and others between 1995 and 1997, resulting in a $90 million overstatement of the Metals Recovery Group's financial position.
 
 
 9
 During this period, Philip also engaged in various transactions involving its own stock. Between the fall of 1996 and the fall of 1997, it acquired 18 companies — 15 of which were American — in stock-for-stock deals. On July 30, 1997 it acquired Serv Tech, Inc. in exchange for 2.7 million shares of Philip common stock. On July 31, 1997 it acquired Allwaste, Inc., in exchange for 23 million shares of Philip common stock. In October 1997 Philip acquired five American corporations for a combination of cash and Philip stock in the transactions underlying the Liff suit.
 
 
 10
 The proposed class period in DiRienzo would extend from February 28, 1996 through and including May 7, 1998. The class would include all purchasers of common stock and call options during that period. The complaint also proposes three subclasses: (a) all purchasers of Philip common stock issued in its November, 1997 public offering pursuant to Philip's November 6, 1997 SEC registration statement; (b) those whose shares of Allwaste, Inc. were exchanged for Philip common stock pursuant to a June 24, 1997 registration statement; and (c) those whose shares of Serv-Tech, Inc. were exchanged for Philip common stock pursuant to a June 24, 1997 registration statement.
 
 
 11
 The 14 director-officer defendants include ten Canadians resident in Ontario. The other four are Americans, one of whom, Robert L. Knauss, has been Philip's chairman of the board since May 1998. Another defendant, Norman Foster, served briefly as president of Philip's By-Products Recovery Group. The director and officer defendants generally signed the allegedly false and misleading statements that were part of the public stock offering. They do not all appear in every count in the complaint, but the various claims arise under § 11 (false registration statements), § 12(a)(2) (false prospectuses or oral communications), and § 15 (liability of controlling persons) of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), 77o; §§ 10(b) (manipulative and deceptive devices) and 20(a) (liability of controlling persons and those who aid and abet violations) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t; and Rule 10b-5, 17 C.F.R. § 240.10b-5 (manipulative and deceptive devices).
 
 
 12
 Defendant Deloitte is a Hamilton, Ontario partnership comprised solely of Canadian partners. As Philip's outside auditor, Deloitte allegedly rendered unqualified opinions on Philip's 1995, 1996, and 1997 financial statements as well as the financial statements underlying the November 1997 public offering, Allwaste, and Serv-Tech registration statements. The causes of action against Deloitte are also based in federal securities law, specifically Securities Act § 11, Securities Exchange Act § 10(b), and Rule 10b-5. The complaint alleges that Deloitte and the director-officer defendants are liable as direct participants, as participants in a common scheme to defraud, and as co-conspirators in the alleged wrong.
 
 
 13
 The underwriter defendants are American brokerage and investment banking firms that underwrote the November 1997 American offering. They received commissions for buying large blocks of stock from Philip and then selling the shares to the plaintiffs. The DiRienzo complaint seeks either rescission or damages from the defendants under Securities Act § 12(a)(2). Canadian firms that under-wrote the Canadian offering are not defendants in this litigation.
 
 
 14
 On June 25, 1999 Philip filed for bankruptcy in both Ontario and, through a subsidiary, in Delaware. Accordingly, all actions against it have been automatically stayed. Philip's current directors and officers therefore are third-party witnesses. Philip has also been sued in Menegon v. Philip Services Corp., No. 4166-CP/98 (Ont.Ct.(Gen.Div.) filed May 5, 1998), a Canadian class action brought in Ontario Superior Court on behalf of Canadian residents who purchased Philip shares between February 28, 1996 and April 23, 1998. The Menegon defendants include Deloitte and the Canadian underwriters of the November 1997 public offering.
 
 
 15
 With that recitation of the background and prior proceedings in this case, we turn to a discussion of the law.
 
 DISCUSSION
 
 16
 In dismissing a case on the ground of forum non conveniens, a district court enjoys wide discretion to which substantial deference is given. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 257, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). Such dismissal is reviewed for an abuse of discretion. Alfadda v. Fenn, 159 F.3d 41, 45 (2d Cir. 1998). A district court abuses its discretion when "(1) its decision rests on an error of law ... or a clearly erroneous factual finding, or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions." Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 169 (2d Cir.2001). In the context of forum non conveniens, we may also reverse when a district court fails to consider all the relevant factors or unreasonably balances those factors. See Piper Aircraft, 454 U.S. at 257, 102 S.Ct. 252.
 
 
 17
 I Deference Owed Plaintiffs' Choice of Forum
 
 
 18
 We held in Iragorri that the "first level of inquiry" in a forum non conveniens analysis is to determine what deference is owed a plaintiff's choice of forum. 274 F.3d at 73. Ordinarily a strong favorable presumption is applied to that choice. Murray v. British Broad. Corp., 81 F.3d 287, 290 (2d Cir.1996). "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). In Iragorri we ruled that a court should begin with the assumption that a plaintiff's choice of forum will stand unless the defendant can demonstrate that reasons exist to afford it less deference. 274 F.3d at 70-71.
 
 
 19
 The district court in the case at hand, relying on Koster v. (American) Lumbermens Mutual Casualty Co., 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947), gave less weight to the plaintiffs' choice of forum because they sued in a representative capacity. In re Philip Servs., 49 F.Supp.2d at 634. In our prior decision the majority disagreed with the district court's interpretation of Koster, see 232 F.3d at 60-62, but we now vacate that portion of the opinion.[2] For even were the district court correct, Iragorri posits that defendants' motion to dismiss should also be viewed with greater skepticism.
 
 
 20
 Affording less deference to representative plaintiffs does not mean they are deprived of all deference in their choice of forum. The trial court, however, after interpreting Koster, appears to have made only passing reference to the weight entitled plaintiffs' choice. See In re Philip Servs., 49 F.Supp.2d at 639-43 (mentioning only once, at the outset of the analysis, that proper deference is owed plaintiffs' choice of forum). To determine what amount of deference should have been given, Iragorri instructs that "[t]he more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice." 274 F.3d at 71-72.
 
 
 21
 Although less than all of the named plaintiffs in DiRienzo reside in the Southern District of New York, no evidence suggests they had an improper motive in bringing suit there. In fact, plaintiffs offered a quite valid reason for litigating in federal court: this country's interest in having United States courts enforce United States securities laws. See Allstate Life Ins. Co. v. Linter Group Ltd., 994 F.2d 996, 1002 (2d Cir.1993). We recognize that this interest is not outcome-determinative in the weighing of relevant factors, see Alfadda, 159 F.3d at 47, but it nonetheless demonstrates a "bona fide" connection to the United States, that is, a valid reason. See Iragorri, 274 F.3d at 72. Further, considering that defendants sought out business opportunities in this country by registering stock on American exchanges, filing statements with the SEC and conducting the bulk of its business in the United States — as well as the claim that most plaintiffs conducted their stock transactions within the United States — a legitimate interest exists in trying this securities fraud litigation here. The SEC reiterated that point in a post-Iragorri amicus letter to the Court.
 
 
 22
 With respect to the complaint being filed in the Southern District of New York, plaintiffs have another reason that the law recognizes as valid: the transfer order of the Judicial Panel on Multidistrict Litigation placed their cases there. Although the consolidated and amended class action complaint was filed after the transfer order — and the transfer order, standing alone, is not dispositive or outcome-determinative — nothing in the record suggests the filing was motivated by anything other than this order. Plaintiffs had already demonstrated their preference to pursue litigation in other districts by filing complaints in the District of New Jersey and the Western District of Pennsylvania.
 
 
 23
 In fact, plaintiffs' decision to pursue consolidated litigation in the Southern District of New York seems to stem from the granting of defendants' motion by the Judicial Panel to transfer the separate cases to this particular district. Iragorri teaches that we should focus on this circumstance. See 274 F.3d at 73 ("[T]he court must consider a plaintiff's likely motivations [for having filed suit in a particular federal district court] in light of all the relevant considerations."). All the parties who responded to defendants' motion agreed as to the propriety of centralizing the litigation, though some of the Pennsylvania plaintiffs preferred consolidating the case in the Western District of Pennsylvania. The Judicial Panel rejected this idea, ruling instead that "[c]entralization ... in the Southern District of New York will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation." In re Philip Servs. Corp. Sec. Litig., No. 1230 (J.P.M.L. June 2, 1998) (emphases added).
 
 
 24
 Thus, defendants' current claims of inconvenience raise questions as to their underlying motives. The way in which they have used procedural tactics ultimately to obtain dismissal of plaintiffs' suit in district court in favor of Canada counsels caution in evaluating their forum non conveniens motion. See Iragorri, 274 F.3d at 75 ("Courts should be mindful that, just as plaintiffs sometimes choose a forum for forum-shopping reasons, defendants also may move for dismissal under the doctrine of forum non conveniens not because of genuine concern with convenience but because of forum-shopping reasons.").
 
 II Assessing Conveniences
 
 25
 A forum non conveniens motion cannot be granted absent an adequate alternative forum. See id. at 73; see also Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 46 (2d Cir.1996). We previously found Ontario an adequate forum to try the instant case. DiRienzo, 232 F.3d at 57-60; id. at 68 (Cabranes, J., dissenting) (agreeing that Canada is an adequate alternative forum). Since that part of our opinion will not be vacated, we need not repeat the analysis here, but rather incorporate it by reference.
 
 
 26
 The next step in assessing convenience is to balance the public and private interest factors articulated in Gilbert. The portion of the original majority opinion weighing the Gilbert factors, DiRienzo, 232 F.3d at 63-67, is now vacated. The burden of demonstrating that the plaintiff's chosen forum is not convenient is on the defendant seeking dismissal. Wiwa, 226 F.3d at 100. Because much of the doctrine's strength derives from its flexibility and each case turns on its own facts, a single factor is rarely dispositive. See Piper Aircraft, 454 U.S. at 249-50, 102 S.Ct. 252.
 
 A. Private Interest Factors
 
 27
 The private interest factors enumerated in Gilbert include: (1) ease of access to evidence; (2) the availability of compulsory process for the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; (4) if relevant, the possibility of a view of premises; and (5) all other factors that might make the trial quicker or less expensive. 330 U.S. at 508, 67 S.Ct. 839; Iragorri, 274 F.3d at 73-74. Only the first three factors are implicated here.
 
 
 28
 We see no error in the district court's finding that the bulk of relevant documents is in Ontario, at either Philip's or Deloitte's Hamilton facilities. In re Philip Servs., 49 F.Supp.2d at 641. We reiterate, however, that plaintiffs should not have been deprived of their choice of forum except upon defendants' clear showing that a trial in the United States would be so oppressive and vexatious to them as to be out of all proportion to plaintiffs' convenience. See Koster, 330 U.S. at 524, 67 S.Ct. 828. The defendants have failed to explain how transporting the documents or copies of them would be "oppressive" or "vexatious," nor does the district court offer a satisfactory explanation. See In re Philip Servs., 49 F.Supp.2d at 641. And, absent an explanation, less weight should be accorded this factor. Cf. Itoba Ltd. v. LEP Group PLC, 930 F.Supp. 36, 44 (D.Conn.1996) ("To the extent documents exist in England, advances in transportation and communication accord this issue less weight."). Of greater significance, the district court committed a legal error by failing to hold defendants to their burden of proof.
 
 
 29
 With respect to the location of witnesses, we agree with the district court's finding that most of the potential witnesses with direct knowledge of the alleged fraud are located in Ontario. In re Philip Servs., 49 F.Supp.2d at 640. Willing witnesses can easily travel from Toronto to New York by a direct 90 minute flight, and Hamilton is less than an hour's drive from Toronto. Such travel today is not burdensome in terms of cost or time, and defendants have not shown otherwise.
 
 
 30
 The most important problem is the unavailability of process to compel unwilling third-party witnesses to appear in the United States. Former Philip employees such as Peter McQuillan, the former comptroller of Philip's Scrap Metals Division, reside in Canada and thus cannot be compelled to testify in American courts as they would be in Canadian courts. Live testimony is especially important in a fraud action where the factfinder's evaluation of witnesses' credibility is central to the resolution of the issues. See Alfadda, 159 F.3d at 48; Allstate, 994 F.2d at 1001; see also Iragorri, 274 F.3d at 75.
 
 
 31
 Despite the preference for live testimony, we have recognized the availability of letters rogatory as relevant in deciding whether plaintiffs' chosen forum is inconvenient. See, e.g., Overseas Programming Cos., Ltd. v. Cinematographische Commerz-Anstalt, 684 F.2d 232, 235 (2d Cir.1982) (noting that "any difficulties... regarding witnesses whose attendance the Court is unable to compel can most likely be resolved by the use of deposition testimony or letters rogatory"); see also In re Livent, Inc. Sec. Litig., 78 F.Supp.2d 194, 211 (S.D.N.Y.1999). While demeanor evidence is important when trying a fraud case before a jury, see Howe v. Goldcorp Invs., Ltd., 946 F.2d 944, 952 (1st Cir.1991), videotaped depositions, obtained through letters rogatory, could afford the jury an opportunity to assess the credibility of these Canadian witnesses. Yet considering the number of witnesses for whom these accommodations would have to be made and the preference for live testimony, the district court did not abuse its discretion when it found this factor weighs in favor of defendants.
 
 
 32
 Hence, on the evidence presented, we think the balance of the private interest factors is close. Gilbert tells us that unless the balance strongly favors defendant, plaintiffs' choice of forum "should rarely be disturbed." 330 U.S. at 508, 67 S.Ct. 839.
 
 B. Public Interest Factors
 
 33
 The Supreme Court has outlined four public interest factors to be weighed in the forum non conveniens inquiry: (1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the "local interest in having localized controversies decided at home;" and (4) avoiding difficult problems in conflict of laws and the application of foreign law. Gilbert, 330 U.S. at 508-09, 67 S.Ct. 839; see also Iragorri, 274 F.3d at 74. We discuss them here slightly out of order, as did the district court.
 
 
 34
 1. Administrative Difficulties. The district court did not abuse its discretion in finding the first factor does not strongly favor either party. See In re Philip Servs., 49 F.Supp.2d at 642. Ontario courts, like the Southern District of New York, suffer from congestion. There may be some administrative advantage in dismissing DiRienzo in Ontario's favor because Menegon, a similar case involving a class of only Canadian plaintiffs, is already pending there. Although the issues in the two cases will obviously overlap, they also differ somewhat because DiRienzo involves American registration statements and the likely application of American law to most claims. In any event, this circumstance is of little weight because the existence of related litigation is not one of the factors enumerated in Gilbert. See Guidi, 224 F.3d at 148.
 
 
 35
 2. Avoiding Conflicts of Law Problems. The district court correctly noted, see 49 F.Supp.2d at 642, that while an Ontario court would likely apply American law to at least the claims arising under §§ 11 and 12(a) of the Securities Act, an American court would likely apply Canadian law to claims by non-resident class members based on the purchase of securities outside the United States. See Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 127-29 (2d Cir.1998); Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 993 (2d Cir. 1975). The interest in avoiding the application of foreign law therefore does not favor either forum.
 
 
 36
 3. Jury Duty Imposed on Community With no Relation to Controversy. The district court did not explicitly discuss this factor. But as has been noted and as will be explored in the next section, the Southern District of New York, home to the American stock exchanges through which Philip sold shares, has a local interest in this lawsuit. Where American investors have allegedly suffered harm from purchases made in New York, that community has an interest in considering such claims.
 
 
 37
 4. Local Interest. The district court found the local interest factor "weigh[ed] heavily in favor of litigation in Ontario." In re Philip Servs., 49 F.Supp.2d at 642. It based its conclusion, for the most part, on the factual finding that "this case predominantly concerns the conduct of a major Canadian corporation in Canada, notwithstanding the involvement of some American entities and persons." Id.
 
 
 38
 This finding is clearly erroneous. It fails to acknowledge as a factual matter that plaintiffs' amended complaint alleges the majority of their securities transactions were conducted entirely in the United States, by Americans, in American dollars, on American stock exchanges. For example, plaintiffs claim that nearly 80 percent of Philip's shares sold during the class period were traded on exchanges in the United States.
 
 
 39
 As the SEC argues in its amicus brief, dismissing this case is no more appropriate than dismissing a products liability case brought in the United States against Toyota simply because the design and manufacture of the automobile took place in Japan. While the complaint alleges a fraud that was largely executed in Ontario, neither the dissemination of the allegedly misleading statements nor the plaintiffs' losses were localized there.
 
 
 40
 Further, the trial court stated that "[p]arties who choose to engage in international transactions, as plaintiffs did here, `cannot expect always to bring their foreign opponents into a United States forum.'" In re Philip Servs., 49 F.Supp.2d at 642. But, the cases cited for this proposition either do not bind us or involve easily distinguishable facts. Hence, the district court's conclusion advances a legal principle inapplicable to the bulk of DiRienzo plaintiffs.
 
 
 41
 In Diatronics, Inc. v. Elbit Computers, Ltd., 649 F.Supp. 122 (S.D.N.Y.1986), aff'd, 812 F.2d 712 (2d Cir.1987), an American corporation had purchased a majority interest in one Israeli corporation from a second Israeli corporation. The contracts at issue had been negotiated and executed in Israel, and the purchaser had hired an Israeli attorney for the negotiations. See id. at 123-25. The district court held that the case should be dismissed in favor of Israel as a forum. See id. at 127-30. Similarly, the First Circuit's decision in Howe emphasized that the Canadian stock at the center of the alleged securities fraud was traded only on Canadian stock exchanges, and that its sellers had made no effort to market it in the United States except in response to unsolicited inquiries. See 946 F.2d at 952-53. Although the final case on which the district court relied involved facts more similar to those before us, the case was actually decided on grounds of international comity and its forum non conveniens comment was dictum. See DeYoung v. Beddome, 707 F.Supp. 132, 133-34, 138 (S.D.N.Y.1989).
 
 
 42
 In contrast to Diatronics and Howe, DiRienzo does not involve Americans who sought out involvement with a foreign forum. It was Philip who came to them by registering its stock on American exchanges, filing statements with the SEC, and conducting the bulk of its business — including multiple corporate acquisitions — in the United States. Plaintiffs are involved in this lawsuit precisely because of aggressive selling techniques by Philip within the United States that targeted United States investors as potential purchasers of its stock.
 
 
 43
 These facts further distinguish DiRienzo from those cases where we have affirmed forum non conveniens dismissals. See, e.g., Alfadda, 159 F.3d at 46-48 (affirming dismissal of Saudi Arabian investors' suit against Netherlands Antilles corporation over conduct of French bank owned by corporation, where all documents and witnesses were in France or Saudi Arabia and documents were in French and no plaintiffs were American); Scottish Air Int'l, Inc. v. British Caledonian Group, PLC, 81 F.3d 1224, 1233-34 (2d Cir.1996) (affirming dismissal where American shareholder sued over the right to a seat on the board of directors of a Scottish corporation, considered to be a decision of internal management); Alcoa Steamship Co. v. M/V Nordic Regent, 654 F.2d 147, 149 (2d Cir.1980) (en banc) (affirming dismissal of admiralty action brought by American corporation after its charter vessel — owned by Liberian corporation — collided with a pier owned by plaintiff in Trinidad); Calavo Growers of Cal. v. Belgium, 632 F.2d 963, 965-66 (2d Cir.1980) (affirming dismissal of breach of contract and fraud action arising out of fig shipment insurance policies negotiated and purchased by parties' brokers in Belgium and possibly involving questions of insurance industry usage in Belgium and the pre-shipment condition of the figs in Turkey).
 
 
 44
 Because the Gilbert test is so fact-specific, a district court's erroneous understanding of facts central to a case can preclude a reasonable balancing of the Gilbert factors and form the basis for reversal on appeal. See R. Maganlal & Co. v. M.G. Chem. Co., 942 F.2d 164, 168 (2d Cir.1991) (finding abuse of discretion where misidentification of the "fundamental issue in the case" affected entire forum non conveniens analysis); Overseas Programming, 684 F.2d at 235 (finding error in balancing of Gilbert factors where court "failed to identify the basic issue in the lawsuit").
 
 
 45
 Reversal is further warranted in the circumstances presented here because the district court's ruling falls outside the permissible range of decisions, once the interest of the United States in enforcing its securities laws is factored into the equation. See Allstate, 994 F.2d at 1002; cf. Howe, 946 F.2d at 953 (explaining that federal securities laws are not meant to protect those who purchased their securities abroad). A strong public interest favors access to American courts for those who use American securities markets. The fraud on the market theory itself illustrates investors' reliance on accurate and complete information. See Basic Inc. v. Levinson, 485 U.S. 224, 245-47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). For securities markets to function efficiently, securities fraud law must be clear and enforceable. As the statute explaining the need for regulation and control of transactions in securities exchanges and over-the-counter markets states, these transactions are "affected with a national public interest." Securities Exchange Act of 1934 § 2, 15 U.S.C. § 78b. Thus, those laws must also be applied consistently with regard to the significant majority of the putative class who bought their securities on American markets.
 
 
 46
 While Ontario has an analogous interest with respect to Canadians who bought their Philip stock in Ontario, they are a small minority of the proposed class and Ontario's interest is correspondingly less. Cf. Wiwa, 226 F.3d at 103 (ruling that the district court applied an incorrect standard of law in its forum non conveniens analysis by "fail[ing] to credit the fact that two of the [four] plaintiffs were United States citizens").
 
 
 47
 Hence, the public interest factors favor an American forum for the trial of this securities fraud litigation to a greater degree than recognized by the district court. Combined with the relatively even balance among private interest factors as a result of defendants' failure to show "oppressiveness and vexation ... out of all proportion to plaintiff[s'] convenience," Koster, 330 U.S. at 524, 67 S.Ct. 828, and the skepticism which should accompany defendants' forum non conveniens motion, we think the district court erred as a matter of law when granting the motion to dismiss this case in favor of it being brought in Canada. An action is to be dismissed "only if the chosen forum is shown to be genuinely inconvenient and the selected forum significantly preferable." Iragorri, 274 F.3d at 74-75. Consequently, although defendants may have shown Canada to be an appropriate forum, they have not met their burden of proving that litigation in the United States is unnecessarily inconvenient for them to a degree much greater than the convenience that would be afforded plaintiffs by trial in the Southern District of New York. See Piper Aircraft, 454 U.S. at 256 n. 23, 102 S.Ct. 252; Koster, 330 U.S. at 524, 67 S.Ct. 828.
 
 CONCLUSION
 
 48
 Accordingly, the judgment in DiRienzo is reversed, and the case remanded to the district court for further proceedings not inconsistent with this opinion.
 
 
 
 Notes:
 
 
 *
 Hon. David G. Trager, United States District Court Judge for the Eastern District of New York, sitting by designation
 
 
 [1]
 Unless otherwise noted, all figures stated are in United States dollars. The Treasury Department advises that the exchange rate for March quarter 1998 was Cdn.$1.00 = United States $0.7048
 
 
 [2]
 Vacating this discussion ofKoster does not impact our resolution of Liff, because that case involved a direct action. See DiRienzo, 232 F.3d at 60.
 
 
 
 49
 JOSÉ A. CABRANES, Circuit Judge, concurring in part and dissenting in part.
 
 
 50
 In Iragorri v. United Technologies Corp., 274 F.3d 65 (2d Cir.2000) (en banc), a unanimous en banc Court principally held that (1) a district court's decision on a motion to dismiss for forum non conveniens "lies wholly within the broad discretion of the district court and may be overturned only when that discretion has been clearly abused," id. at 72 (internal quotation marks and citation omitted); and (2) "review of a motion to dismiss for forum non conveniens should begin with the assumption that the plaintiff's choice of forum will stand" but "the degree of deference given to a plaintiff's forum choice varies with the circumstances," id. at 71.
 
 
 51
 The instant case lies at the crossroads of those two standards. Accordingly, while I concur in Part I of the majority's Discussion in its opinion on the motion for panel rehearing (concerning the deference owed plaintiffs' choice of forum, see ante at ___ - ___), I am unable to agree with its analysis in Part II, which rebalances the factors enumerated in Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), see ante at 13-23, that were already weighed by the District Court in a careful and thoughtful opinion, see In re Philip Servs. Corp. Sec. Litig., 49 F.Supp.2d 629, 639-643 (S.D.N.Y.1999). I therefore dissent from the panel's disposition of this case. "[S]ubstituting our view of the matter for that of the district court" is impermissible after Iragorri, 274 F.3d at 72 — which, as an en banc opinion of our Court, establishes the authoritative standard for the application of forum non conveniens principles in this Circuit. Accordingly, although I believe that the majority's analysis in Part I is correct, I do not agree that the majority has accorded appropriate deference to the District Court's evaluation of the public and private interest factors that, taken together, should be controlling.
 
 
 52
 I am pleased to join Part I of the majority's Discussion, which addresses the deference to be accorded a plaintiff's choice of forum. See ante at ___ - ___. In that portion of the opinion, the majority, as prescribed in Iragorri, focuses on the legitimacy of plaintiffs' reasons for choosing the forum, see 274 F.3d at 71-72 ("The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice."). Ante at ___ - ___. In addition, the majority properly observes that defendants' claims of inconvenience may be anomalous in light of defendants' earlier motion before the Judicial Panel on Multidistrict Litigation to transfer the separate cases to the Southern District of New York. Id. at ___.
 
 
 53
 Nevertheless, I dissent with respect to Part II of the majority's Discussion, which, in my view, does not give adequate deference to the District Court's decision. See id. at ___ - ___. In the introduction to its Discussion, the majority sets out the abuse of discretion standard applicable to our review of a district court's decision on a motion to dismiss for forum non conveniens. Id. at ___. While this is unquestionably the appropriate standard of review, I disagree with the majority's application of that standard.
 
 
 54
 In Iragorri, we emphasized the considerable deference to be accorded a district court's decision on a motion to dismiss for forum non conveniens. 274 F.3d at 72. We stated,
 
 
 55
 The decision to dismiss a case on forum non conveniens grounds "lies wholly within the broad discretion of the district court and may be overturned only when we believe that discretion has been clearly abused." Scottish Air Int'l, Inc. v. British Caledonian Group PLC, 81 F.3d 1224, 1232 (2d Cir.1996) (emphasis added). In other words, "[o]ur limited review ... encompasses the right to determine whether the district court reached an erroneous conclusion on either the facts or the law." Guidi, 224 F.3d at 145 (internal quotation marks omitted); Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC, 155 F.3d 603, 609 (2d Cir.1998) ("Our review of a forum non conveniens dismissal is extremely limited." (emphasis added)). Accordingly, we do not, on appeal, undertake our own de novo review, simply substituting our view of the matter for that of the district court.
 
 
 56
 Id. (underlining emphasis added). In light of that strong language stressing the deference owed to a district court's determination under the abuse of discretion standard and our extremely cabined review, I cannot in good faith, after Iragorri, support the rebalancing of the Gilbert factors in Part II of the majority opinion. Accordingly, I respectfully adhere to the views that I expressed in my original dissent in this case, see DiRienzo, 232 F.3d at 68-72 (Cabranes, J., dissenting), concerning the District Court's weighing of the Gilbert factors.[1]
 
 
 57
 With that said, I take comfort in noting that the petition for panel rehearing in this long-lived case has been pending since well before our decision in Iragorri, and, of course, it is that recent, unanimous decision of the en banc Court that now stands as our Circuit's authoritative statement of the law.
 
 
 
 Notes:
 
 
 [1]
 Since the majority's original opinion on this subject is now vacated, my prior dissent should be read in conjunction with the majority's new opinion